UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BRIAN D. PETTIFORD,

**ORDER**

Plaintiff,                                    14 Civ. 6271 (JCM)

-against-

THE CITY OF YONKERS, YONKERS POLICE
OFFICER VINNIE DEVITO, YONKERS POLICE
OFFICER ALEX DELLADONNA, YONKERS POLICE
OFFICER PETER SCHWARTZ, YONKERS POLICE
OFFICER DENNIS MOLINA #646, YONKERS
POLICE OFFICER CHRISTIAN KOCH #699, ALL
DEFENDANTS INDIVIDUALLY AND IN THEIR
OFFICIAL CAPACITIES AS EMPLOYEES OF
THE CITY OF YONKERS,

Defendants.
-----------------------------------------------------------------X

Plaintiff Brian Pettiford ("Plaintiff") brings this action against Defendants City of

Yonkers ("Yonkers" or "City"), Officer Alex Delladonna, Officer Peter Schwartz ("Schwartz"),

Officer Vinnie DeVito ("DeVito"), Officer Dennis Molina ("Molina"), and Officer Christian

Koch ("Koch") (collectively, "Defendants") pursuant to 42 U.S.C. § 1983, alleging an illegal

search, false arrest, malicious prosecution and wrongful conviction. Plaintiff now moves

pursuant to Federal Rule of Civil Procedure 15 ("Rule 15") for leave to amend his complaint

("Motion") to assert an additional 42 U.S.C. § 1983 claim pursuant to *Monell v. Department of*

*Social Services of City of New York*, 436 U.S. 658 (1978) ("*Monell*"). (Docket No. 172).

Defendants opposed the Motion, (Docket Nos. 180–181), and Plaintiff replied, (Docket No. 183).

For the reasons set forth below, the Motion is denied.[1]

---

[1] This action is before the undersigned on consent of the parties pursuant to 28 U.S.C. § 636(c). (Docket No. 21)

- 1 -

## I. BACKGROUND[2]

In or around February 2012, Officer Molina initiated a criminal investigation into Plaintiff's purported sale of marijuana from 480 South Broadway, Yonkers, New York, based on a tip that he claimed to have received from a certain confidential informant ("CI 173"). (Docket No. 173-1 ¶ 26) ("Proposed SAC"). Officer Molina claimed that he used CI 173 to effectuate two "controlled buys" of narcotics at 480 South Broadway. (*Id.* ¶ 27). After the second alleged controlled buy, Officer Molina provided information from the investigation to his partner, Officer Koch, who completed a search warrant affidavit ("Search Warrant Affidavit"). (*Id.* ¶¶ 34–35). Plaintiff alleges that Molina provided "information he knew to be false and manufactured" to Koch, who signed the Search Warrant Affidavit "knowing it to contain false information." (*Id.* ¶¶ 34–36). A search warrant for 480 South Broadway ("Search Warrant") was approved by a judge based on the Search Warrant Affidavit. (*Id.* ¶ 38).

On March 22, 2012, Officers Koch, Molina and DeVito executed the Search Warrant. (*Id.* ¶ 40). Detective Molina alleged that a pistol was found during the search. (Docket No. 173 ¶ 6). Plaintiff was arrested and charged with criminal possession of a weapon in the third degree. (*Id.* ¶ 7). Plaintiff plead guilty to the charge on November 28, 2012 and was sentenced to one and one-third to three years' imprisonment. (*Id.*).

In 2014, Koch was convicted of perjury in the second degree in connection with an unrelated search warrant affidavit that he swore out. (*Id.* ¶ 12). On August 1, 2014, Plaintiff filed a *pro se* complaint, alleging that the March 22, 2012 search violated his constitutional rights. (*Id.* ¶¶ 8–9). Thereafter, in 2018, the Westchester County District Attorney's Office ("WCDAO")

---

[2] The facts are drawn, in part, from the proposed Second Amended Complaint, (Docket No. 173-1), and are assumed to be true only for purposes of the instant Motion. *See Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 366 n.4 (S.D.N.Y. 2014).

conducted a public integrity investigation into the Yonkers Police Department ("YPD"). (Proposed SAC ¶ 44). Subsequent to the investigation, the WCDAO determined that: (a) "Koch swore to five narcotics search warrant affidavits containing statements of fact that were in conflict with the records of the Yonkers Police Department and Yonkers Forensic Laboratory;" including (b) the Search Warrant Affidavit effectuated at 480 South Broadway. (*Id.* ¶ 45) (internal quotations omitted). Specifically, the WCDAO found that Koch's statement in the Search Warrant Affidavit that CI 173 executed controlled buys of narcotics at 480 South Broadway was inconsistent with YPD records indicating that another confidential informant was used in connection with the investigation. (*Id.* ¶ 46). Moreover, the Search Warrant Affidavit stated that the drug evidence from the controlled buys was sent to the YPD Forensic Laboratory on March 22, 2012 — before the Search Warrant was executed — but YPD records indicated that the evidence was not received until several days after the Search Warrant's execution. (*Id.* ¶ 47). The WCDAO moved to vacate the criminal complaint against Plaintiff stemming from the March 22, 2012 search pursuant to N.Y. C.P.L. § 440.10(1)(b), on the ground that Koch's perjury conviction and the inconsistences in the Search Warrant Affidavit raised serious concerns as to the "survivability" of Plaintiff's conviction. (*Id.* ¶¶ 48–49).

As a result of the WCDAO's investigation, Plaintiff learned of the Search Warrant's inconsistencies. (Docket No. 173 ¶ 9). On July 19, 2019, Plaintiff moved to amend his complaint. (Docket Nos. 136–38). The Court issued an order on February 13, 2020 granting Plaintiff leave to amend to: (1) include additional facts relating to the WCDAO investigation in support of his civil rights claims; (2) assert additional 42 U.S.C. § 1983 claims for the denial of due process and a fair trial; and (3) request attorney's fees pursuant to 42 U.S.C. § 1988. (Docket No. 151). The Court rejected Plaintiff's request for leave to add a *Monell* claim. (*Id.*). Plaintiff

moved for reconsideration of the Court's decision regarding his *Monell* claim, which the Court denied on April 27, 2020, finding that Plaintiff failed to "specify any deficiency about [YPD's] training program" and failed to establish causation. (*See* Docket No. 167 at 6[3]). Plaintiff filed his First Amended Complaint ("FAC") on February 18, 2020, (Docket No. 152), and discovery continued, (*see* Docket No. 173 ¶ 18).

On September 25, 2020, after deposing certain Yonkers personnel, Plaintiff moved again to amend the FAC to assert a *Monell* claim against Yonkers. (Docket Nos. 172–74). In support of the Motion, Plaintiff submitted a memorandum of law, (Docket No. 174) ("Pl. Br."), the Declaration of Thomas O. O'Connor, (Docket No. 173), the Proposed Second Amended Complaint, (Docket No. 173-1), and several deposition transcripts, (Docket No. 173-2–173-4). On October 23, 2020, Defendants submitted a memorandum of law in opposition, (Docket No. 180) ("Def. Br."), along with the Declaration of Andrew Quinn, (Docket No. 181) ("Quinn Decl."), and accompanying exhibits, (Docket Nos. 181-1–181-8). Plaintiff replied on October 30, 2020. ("Pl. Reply"). For the foregoing reasons, Plaintiff's Motion is denied.

## II. DISCUSSION

Rule 15 governs "motions to amend the pleadings once the time for amending a pleading as of right has expired." *Moroughan v. Cty. of Suffolk*, 99 F. Supp. 3d 317, 322 (E.D.N.Y. 2015). Pursuant to Rule 15(a), leave to amend shall be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Under this liberal standard, a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016).

---

[3] All page number citations to the record refer to the ECF page number unless otherwise noted.

## A.  Undue Prejudice

While "[p]rejudice to the opposing party" is "the most important reason for denying a motion to amend," "only *undue* prejudice justifies denial." *Blagman v. Apple, Inc.*, No. 12 Civ. 5453(ALC)(JCF), 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (emphasis in original) (quoting *Frenkel v. New York City Off-Track Betting Corp.*, 611 F. Supp. 2d 391, 394 (S.D.N.Y. 2009)).  To determine whether a proposed amendment will cause undue prejudice, courts "generally consider whether the assertion of the new claim or defense would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block v. First Blood Assoc.*, 988 F.2d 344, 350 (2d Cir. 1993)).

Central to the undue prejudice analysis is the extent to which the new claims arise from existing ones and whether the non-movant had prior notice of the new claims. *See Blagman*, 2014 WL 2106489, at *3.  Courts are most hesitant to allow an amendment where the proposed claim "unfairly surprises the non-movant and impedes the fair prosecution of the claim." *Monahan*, 214 F.3d at 284.  Conversely, that the non-movant had information giving rise to the proposed claim weighs against a finding of prejudice. *Id.* (citing *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877–78 (9th Cir. 1995)); *accord Block*, 988 F.2d at 350–51 (affirming grant of defendant's application to raise a statute of limitations defense in its motion for summary judgement, four years after plaintiffs filed the complaint, because, *inter alia*, plaintiffs had notice of the facts giving rise to the affirmative defense).  "The non-moving party bears the burden 'of demonstrating that substantial prejudice would result were the proposed amendment to be

granted.'" *Agerbrink,* 155 F. Supp. 3d at 454 (quoting *Oneida Indian Nation of New York State v. Cty. of Oneida, N.Y.*, 199 F.R.D. 61, 77 (N.D.N.Y. 2000) ("*Oneida*")).

Defendants argue that adding the proposed *Monell* claim will "essentially start a new case at the close of fact discovery," causing Defendants to incur significant additional costs. (Def. Br. at 21). Defendants aver that Plaintiff has already propounded "broad and burdensome discovery" requests concerning his "rolling requests to amend," with which Defendants have complied. (*Id.* at 20). Plaintiff asserts that Defendants' claims of "additional costs and trial preparation" do not constitute undue prejudice, and that the proposed *Monell* claim arises from the same facts as Plaintiff's other claims. (Pl. Br. at 20; Pl. Reply at 2–3). Plaintiff further maintains that "Yonkers is fully aware of its own conduct" and already has knowledge of the facts giving rise to the proposed *Monell* claim. (Pl. Br. at 20).

Despite Plaintiff's contentions otherwise, the proposed *Monell* claim would "open previously prohibited areas of discovery." *See Blagman*, 2014 WL 2106489, at *4. Nevertheless, "the need for new discovery is not sufficient to constitute undue prejudice on its own," since the "prejudice that would flow from any additional required discovery can generally be mitigated by adjustments to the discovery schedule." *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 100–01 (S.D.N.Y. 2010) (collecting cases); *accord A.V. by Versace, Inc. v. Gianni Versace, S.p.A*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) ("Allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute 'undue prejudice.'"). Moreover, the proposed claim "arises from the same transaction as the claims in the original pleading," *i.e.*, the procurement of an illicit search warrant based on false statements. *See Agerbrink*, 155 F. Supp. 3d at 455; *A.V. by Versace*, 87 F. Supp. 2d at 299 (holding that there was no undue prejudice to defendants where the proposed amendments "do not raise factual

claims unrelated to the events [in the] original . . . complaint.").  Relatedly, Defendants have

known of the facts giving rise to a potential *Monell* claim against Yonkers since at least 2018,

when the WCDAO conducted its integrity investigation and uncovered that Koch had sworn out

five warrant affidavits containing factual inconsistencies. (Proposed SAC ¶¶ 46–47).  Thus,

Defendants are not "unfairly surprise[d]" by the proposed *Monell* claim. *See Monahan*, 214 F.3d

at 284 (holding that courts will allow amendment where the party "had knowledge of the facts

giving rise to the [amendment].").

Defendants further contend that they have been "litigating . . . Plaintiff's claims for

nearly six years," and are prejudiced by "the length of [Plaintiff's] delay," in bringing his

Proposed SAC, since witnesses involved in Plaintiff's claim will no longer remember the events

in question and documents needed to defend the claim are unavailable. (Def. Br. at 18–19).  It is

well-settled that "the risk of substantial prejudice" generally "increases with . . . time." *GEOMC

Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 100 (2d Cir. 2019) (quoting 6 CHARLES

ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1488 at 652–57 (3d ed. 2018)).

Nonetheless, "under the liberal standard of Rule 15(a), leave to amend may be appropriate at any

stage of litigation." *Duling*, 265 F.R.D. at 97 ("courts have granted leave to amend 'following

discovery . . . at the beginning, during, and at the close of trial; after a judgment has been

entered; and even on remand following an appeal.'") (quoting 6 CHARLES ALAN WRIGHT ET

AL., FEDERAL PRACTICE & PROCEDURE § 1488 at 652–57 (2d ed. 1990)).

Although Defendants do not argue undue delay as a separate ground for denial, delay and

prejudice are related insofar as "prejudice tends to increase with delay." *See Oneida*, 199 F.R.D.

at 77.  Moreover, where a moving party explains its delay, the opposing party must make a

"greater showing" of prejudice. *See id.*  Here, Plaintiff explains that the Proposed SAC is based

upon new evidence that Plaintiff obtained after completing depositions of certain YPD personnel, which concluded on August 11, 2020. (Pl. Br. at 19). Thus, Plaintiff's delay is not undue, since his amendment reflects newly discovered information that Plaintiff did not know at the time that he brought his FAC.[4] *See Moroughan*, 99 F. Supp. 3d at 324 (holding that there was no undue delay in adding a *Monell* claim where the plaintiff explained that after filing his original complaint, subsequent developments brought new information to light).

Defendants maintain that they will be unduly prejudiced because "the passage of time" may have resulted "in a loss of memory by witnesses." (Def. Br. at 19). However, the cases Defendants cite in support of this argument are inapposite because those cases were dismissed due to a party's bad faith failure to comply with court orders, *causing* a delay in the proceedings. *See, e.g.*, *Georgiadis v. The First Boston Corp.*, 167 F.R.D. 24, 26 (S.D.N.Y. 1996) (dismissing action under Rule 37 where party willfully disregarded a discovery order after previous warning "that noncompliance with discovery orders could lead to dismissal . . . if the party's noncompliance caused serious delay."); *Peart v. City of New York*, 992 F.2d 458, 461 (2d Cir. 1993) (affirming dismissal of action under Rule 41 where plaintiff's counsel refused to comply with two court orders and showed an "utter contempt and lack of respect for the court") (internal quotations omitted). With the exception of circumstances involving bad faith, the "potential effect of the passage of time on witness memories" does not necessitate denial of leave to amend.

---

[4] Defendants argue that Plaintiff mischaracterizes the deposition testimony quoted in the Proposed SAC. (*See* Quinn Decl. ¶¶ 11–20; Def. Br. at 9–12). Defendants quote alternate portions of the same deponents' testimony to rebut Plaintiff's allegations. (*See* Quinn Decl. ¶¶ 11–20). Although Defendants dispute Plaintiff's version of events, such issues of fact cannot be determined on a motion to amend. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 92 (2d Cir. 2002) *abrogated on other grounds by Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 Fed. Appx. 63 (2d Cir. 2019). At this juncture, the Court must accept all factual allegations in the proposed amendment as true and draw all reasonable inferences in Plaintiff's favor. *See id.* at 87, 91–92 (reversing denial of amendment as futile, where, although defendants "vigorously dispute[d]" plaintiff's characterization of events, the "proposed [amendment] adequately set[] forth specific facts, which if proven, [could] support a finding of [liability].")

*See, e.g.*, *Duncan v. City of New York*, No. 11–CV–3901 (ENV)(JO), 2014 WL 3530858, at *3 (E.D.N.Y. July 15, 2014); *Contrera v. Langer*, 314 F. Supp. 3d 562, 575 (S.D.N.Y. 2018) (finding defendant's argument that "the passage of time may have caused witnesses's memories of the events to deteriorate . . . insufficient to deny leave to amend"); *Ocampo v. 455 Hospitality LLC*, 14 Civ. 9614 (KMK)(PED), 2019 WL 11556745, *2–3 (S.D.N.Y. Sept. 19, 2019) (concluding that defendant's arguments for delay, including that "witnesses' memories have undoubtedly faded in the intervening years," did not justify leave to amend, even where complaint was filed five years before proposed amendment).

Defendants further allege that the unavailability of certain documents due to the age of this case will prejudice their defense. (Def. Br. at 19). The authorities to which Defendants cite are distinguishable and do not support denial of leave to amend due to undue prejudice. For instance, in *iMedicor, Inc. v. Access Pharmaceuticals*, 290 F.R.D. 50 (S.D.N.Y. 2013), a case where plaintiff claimed it was not compensated for marketing services performed for defendant, plaintiff sough to amend its complaint to add a quantum meruit claim. *Id.* at 51. Such a claim required plaintiff to establish details (*e.g.*, the "reasonable value") of the marketing services that twelve of plaintiff's employees performed for defendant. *Id.* at 53. The court denied plaintiff's leave to amend after finding that the whereabouts of all twelve employees were unknown, making defendant's ability to obtain discovery from witnesses "diminished if not . . . impossible." *Id.* at 54. The court further recognized that "this [was] not a case where new information gleaned from discovery created the basis for bringing new claims" and emphasized that plaintiff waited an additional nine months to bring its quantum meruit claim to pursue mediation in hopes that the case would settle. *Id.* at 53. Similarly, in *Grace v. Rosenstock*, 169 F.R.D. 473 (E.D.N.Y. 1996), the court found undue prejudice where the proposed amendment

would require "re-open[ing] *all* of the depositions that ha[d] taken place," which the court concluded would be "impeded by the fact that certain witnesses . . . ha[d] died, many of the relevant entities [were] no longer in business and many documents ha[d] been destroyed . . ." (emphasis added). *Id.* at 482 n.5.

The instant case is dissimilar to *iMedicor* and *Grace*. Plaintiff brought his motion to amend on September 25, 2020, about a month after deposing Lieutenant Thomas Cleary ("Cleary"), whose testimony Plaintiff relies on in support of his *Monell* claim. (Docket Nos. 172, 181-4). Further, Plaintiff has already deposed key witnesses to his *Monell* claim, including Officers Koch and Molina, Lieutenant Cleary, Sergeant Robert Bock and Detective Dennis Hanrahan. (Docket Nos. 181-4–181-8). "In the end the prejudice inquiry involves a balancing process." *Oneida*, 199 F.R.D. at 77. The court weighs "'the potential for prejudice resulting from granting the amendment against the risk of prejudice to the moving party if the amendment is denied.'" *Id.* (quoting *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 112 F.R.D. 417, 419 (S.D.N.Y. 1986)). While the Court agrees that adding a *Monell* claim would prejudice Defendants since the incident giving rise to the claim happened nearly nine years ago, the Court finds that any prejudice would not be undue. Defendants have been aware of the facts underlying the proposed *Monell* claim for several years, which arise from the same events as Plaintiff's original claims. Accordingly, Defendants have not demonstrated that they will be unduly prejudiced by the proposed amendment.

**B. Futility**

Defendants argue that Plaintiff's proposed *Monell* claim is futile, as it neither articulates an official "policy or custom" nor pleads facts supporting the inference that such a policy or custom caused Plaintiff's injuries. (Def. Br. at 7–16). Plaintiff counters that the Proposed SAC

adequately pleads a *Monell* claim against Yonkers for failing to train or supervise its officers on the "proper practices to be used in procuring and executing search warrants to avoid false, unreliable and tainted evidence from being manufactured against criminal defendants." (Proposed SAC ¶ 71).

An amendment to a pleading is "futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) *abrogated on other grounds by Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 Fed. Appx. 63 (2d Cir. 2019). In order to survive a motion to dismiss, a plaintiff must demonstrate that their right to relief is more than speculative by alleging "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A plaintiff is not required to provide 'detailed factual allegations' in the complaint, but must assert 'more than labels and conclusions.'" *GLD by GD v. City of New York*, No. 19 Civ. 4314 (AT), 2020 WL 5076824, at *1 (S.D.N.Y. Aug. 27, 2020) (quoting *Twombly*, 550 U.S. at 555). To determine whether a plaintiff has "nudged their claim[] across the line from conceivable to plausible," courts distinguish between conclusory pleadings, which are not entitled to the assumption of truth, and factual allegations that are presumed to be true. *Twombly*, 550 U.S. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."). A "boilerplate recitation" of a claim's elements will not survive a motion to dismiss. *See, e.g.*, *Dayton v. City of Middletown*, 786 F. Supp. 2d 809, 822–23 (S.D.N.Y. 2011) (dismissing *Monell* claim where factual assertions in complaint were "boilerplate" and "too conclusory").

**1. *Monell* Claim**

To establish municipal liability under Section 1983 "for unconstitutional acts by a municipal employee below the policymaking level," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), a plaintiff must establish "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right," *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). The "policy or custom" element requires a plaintiff to demonstrate that a municipal policy *itself* violates the constitution. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *accord Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("under § 1983, local governments are responsible only for 'their *own* illegal acts[;]' [t]hey are not vicariously liable . . . for their employees' actions.") (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)).

A policy or custom may be established by showing:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted).

**i. Deliberate Indifference**

"*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds*

*v. Giulani*, 506 F.3d 183, 192 (2d Cir. 2007). Thus, "in certain, limited circumstances," municipal liability may be based on a municipality's inaction, *i.e.*, its failure to train, supervise or discipline subordinates, if "the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality . . . can be found deliberately indifferent to the need." *Id.*; *accord Vann*, 72 F.3d at 1049 ("A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible [constitutional violation] by its police officers, exhibited deliberated indifference.").

The Second Circuit sets forth three prerequisites to a finding that a municipality's inaction constitutes deliberate indifference: (1) the policymaker knows "to a moral certainty" that their employees will confront a given situation; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or . . . there is a history of employees mishandling the situation;" and (3) mishandling the situation will "frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992). Implicit in *Walker*'s second requirement is that a municipal actor must have disregarded a *known* or *obvious* consequence of their inaction. *See Connick*, 563 U.S. at 61; *Bd. of Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown*, 520 U.S. 397, 410 (1997) ("'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."). Put another way, a municipality's nonfeasance will not constitute deliberate indifference unless the municipality was on notice of a need to act. *See Tchatat v. O'Hara*, 14 Civ. 2385 (LGS), 2017 WL 3172715, at *8 (S.D.N.Y. July 25, 2017). Thus, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Id.* (quoting

*Connick*, 563 U.S. at 62) (internal quotations omitted); *see also Vann*, 72 F.3d at 1049 ("An obvious need [to act] may be demonstrated through proof of repeated complaints of civil rights violations[.]").

Additionally, a plaintiff must allege that despite an obvious need to act, the municipality made no "meaningful attempts" to forestall future constitutional violations. *See Tieman v. City of Newburgh*, No. 13–CV–4178 (KMK), 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (quoting *Hart v. City of Binghamton*, No. 3:10–CV–1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012)); *Vann*, 72 F.3d at 1049 ("[d]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.").

## ii. Custom or Usage

A municipality may also be subject to liability based on "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker . . . on the theory that the relevant practice is so widespread as to have the force of law." *Tieman*, 2015 WL 1379652, at *16 (quoting *Brown*, 520 U.S. at 404).  To prevail on such a theory, a plaintiff must establish that the relevant custom is "permanent and well-settled." *Id.*; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

## iii. Causation

In addition to showing a policy or custom, a plaintiff must demonstrate an affirmative causal link between an official policy or custom and the plaintiff's injury to support municipal

liability. *See Batista*, 702 F.2d at 397. The policy must be "closely related to" or the "moving force behind" the ultimate injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 391 (1989) (alteration omitted); *accord City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue.")

Additionally, a plaintiff must show that the municipal defendant's actions proximately caused his injuries. *See Nelson v. City of New York*, No. 18 Civ. 4636 (PAE), 2019 WL 3779420, at *8 (S.D.N.Y. Aug. 9, 2019) ("§ 1983 actions embed 'the tort principle of proximate causation.'") (quoting *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007)). Thus, "an intervening act or omission that is 'extraordinary under the circumstances' and . . . 'not foreseeable in the normal course of events' . . . may break the causal chain of events and remove liability from an earlier acting defendant." *Martin v. City of New York*, 793 F. Supp. 2d 583, 586 (E.D.N.Y. 2011) (quoting *Derdiarian v. Felix Contracting Corp.*, 434 N.Y.S.2d 166, 169 (1980)).

## 2. Plaintiff's Theories of Municipal Liability

Plaintiff alleges that Yonkers is liable for its deliberate indifference to the need to train or supervise its officers with respect to search warrant applications, specifically, that Yonkers failed to train its officers that such applications cannot include "false, unreliable," "tainted," or "manufactured" evidence. (Proposed SAC ¶ 71). Plaintiff argues in the alternative that Yonkers acquiesced to a permanent and well-settled custom of YPD officers swearing out constitutionally infirm warrant applications. (*Id.* ¶ 94).

### i. Deliberate Indifference

The Proposed SAC alleges that Yonkers was deliberately indifferent to the need to supervise or train its officers regarding "proper practices . . . used in procuring and executing search warrants," allegedly resulting in the "implement[ation] and toler[ance]" of "plainly criminal policies," and a "years-long systematic and institutionalized practice of conducting criminal investigations, which violated the fundamental civil rights of Plaintiff." (*Id.* ¶¶ 71–76, 79, 94). The Proposed SAC pleads that "[t]he [YPD] conducted no formal or informal training of narcotics detectives," which it supports with excerpts of Koch, Molina and Cleary's deposition testimony. (*See, e.g.*, *id.* ¶¶ 73, 79, 86). Specifically, the Proposed SAC claims that neither Koch nor Molina were trained or supervised regarding the "proper procedures, policies and standards for a search warrant application," including "the quantum or quality of information that was required to support a search warrant application." (*Id.* ¶¶ 74–75, 83). It also alleges that Molina was not trained on "controlled buys" or handling confidential informants, (*id.* ¶ 84), that Koch's training was "so deficient at the time he sponsored" the Search Warrant Affidavit, that he "didn't know what an affidavit was" and believed he was "just [] fill[ing] in . . . blank[s]" on a form, (*id.* ¶ 76), and that Koch did not know that affidavits could not include "falsehoods regarding the past proven reliability [of a confidential informant]," (*id.* ¶ 92). The Proposed SAC further states that "Koch's personal lack of training was exacerbated by the indifference of the entire supervisory apparatus in the Narcotics Division," and that "everybody was on board" with the falsehoods Koch swore to on warrant affidavits insofar as once "a search warrant was signed by a judge . . . [t]he supervisors [in the Narcotics Division] didn't look at it . . ." (*Id.* ¶ 77). Defendants respond that the proposed *Monell* claim is futile, specifically contending that

Plaintiff does not adequately allege that Yonkers' inaction constituted deliberate indifference or that the alleged indifference caused Plaintiff's injuries. (Def. Br. at 12–16).

Although Plaintiff's failure to train and failure to supervise theories are plead together, "these theories emphasize different facts and require different showings in order to establish deliberate indifference," and must therefore be analyzed independently. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 (2d Cir. 2004).

## ii. Failure to Train

Due to the "'nebulous' nature of a failure-to-train claim and the degree to which inadequate training is 'removed from the constitutional violation' itself, '[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'" *Adams v. City of New Haven*, No. 3:14–cv–00778 (JAM), 2015 WL 1566177, at *3 (D. Conn. Apr. 8, 2015) (quoting *Connick*, 563 U.S. at 61). In addition to *Walker's* requirements, a plaintiff claiming failure to train must "plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379652, at *22. Thus, to survive a motion to dismiss, the complaint must plainly identify the type of training the government employees lacked and include "enough factual material . . . for the court to reasonably infer that the police misconduct" was not the result of "the individual acts of the arresting officers." *See Simms v. City of New York*, No. 10–CV–3420 (NGG)(RML), 2011 WL 4543051, at *2 (E.D.N.Y. Sept. 28, 2011); *aff'd*, 480 Fed. App'x 627, 631 n.4 (2d Cir. 2012) ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery . . . this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim.").

The Proposed SAC fails to adequately plead that the City was deliberately indifferent to a need to train its officers "to avoid false, unreliable and tainted evidence from being manufactured against criminal defendants." (Proposed SAC ¶ 71).  Applying the *Walker* factors, it is foreseeable that police officers will confront situations where they are required to prepare warrant affidavits, and that the inclusion of falsehoods or tainted and/or unreliable evidence in affidavits will frequently result in the deprivation of citizens' constitutional rights. *See Walker*, 974 F.2d at 297–98.  However, Plaintiff fails to adequately plead *Walker*'s second element, which requires allegations that: (1) the situation for which training is allegedly lacking presents officers with a "difficult choice" that training will make less difficult; or (2) there is a known history of officers improperly handling the situation. *See id.*

The scenario presented in the Proposed SAC involves an officer's decision between completing a warrant application truthfully and submitting a perjurious affidavit to a court.  This decision can be resolved with common sense. *Id.* at 297.  The proper response — "to follow one's oath [and] not to commit the crime of perjury . . . — is obvious to all without training or supervision." *Id.* at 299–300; *accord Lambert v. City of New York*, No. 12 Civ. 4715 (AT), 2014 WL 8708238, at *8 (S.D.N.Y. June 16, 2014) ("the right thing to do — to only tell the truth, to only prosecute the guilty, etc. — is obvious without training"); *cf Tchatat*, 2017 WL 3172715, at *9 ("nothing 'more than the application of common sense is required' for a NYPD officer to decide not to frame an individual of wrongdoing.") (quoting *Walker*, 974 F.2d at 297).  Moreover, YPD's search warrant affidavits explicitly state that the recitations therein are "duly sworn." (*See* Pl. Br. at 12).  Thus, the alleged failure to train officers not to commit or suborn perjury "is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train[.]" *Walker*, 974 F.2d at 300.

However, "[w]hile it is reasonable for city policymakers to assume their employees possess common sense, where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by" failing to train their officers on the wrongs of perjury. *Id.* The Proposed SAC fails to articulate that Yonkers was "aware of a pattern of perjury by police officers but failed to institute appropriate training." *Id.*[5]; *accord Beltran v. City of New York*, 19 Civ. 4647 (NRB), 2020 WL 4260990, at *4 (S.D.N.Y. July 22, 2020) (dismissing *Monell* claim premised on a failure to train where plaintiff did not plead the "requisite history of misconduct" required by *Walker*); *see also Lambert*, 2014 WL 8708238, at *8 (granting summary judgment to defendant where plaintiff failed to adduce evidence showing that the city-defendant "has a history of employees planting evidence, committing perjury, or prosecuting the innocent" or that there is "a likelihood that failing to train officers not to take those actions would result in officers committing those acts").

Although Koch's perjury eventually became known to Yonkers, Plaintiff does not aver that Yonkers was aware of Koch's behavior at the time the Search Warrant was executed at 480 South Broadway. *Cf Boddie v. City of New York*, 1:15-cv-4275-GHW, 2016 WL 1466555, at *4 (S.D.N.Y. Apr. 13, 2016) (report recommending improvements to existing training program published several months after plaintiff's arrest did not put city on notice of need to train). Furthermore, Plaintiff does not allege that any other YPD officer engaged in similar misconduct, including Officers DeVito, Delladonna or Schwartz, who are named Defendants in this action. The actions of two municipal officers, without more, are insufficient to establish that Yonkers

---

[5] This decision is consistent with the Second Circuit's ruling in *Walker*, in which the court determined that the complaint at issue survived a motion to dismiss and allowed plaintiff to "pursue discovery in order to determine whether there was a practice of condoning perjury . . . or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth." 974 F.2d at 300. However, *Walker*'s holding is inapplicable to the instant case because of the Supreme Court's intervening decisions in *Twombly* and *Iqbal*, "which set a much higher pleading standard than the one applied by the Second Circuit in *Walker*." *Beltran*, 2020 WL 4260990, at *4 n.7.

had notice that its officers had sworn out or assisted in the swearing out of false or tainted affidavits. *See Amnesty Am.*, 361 F.3d at 127. Accordingly, Plaintiff fails to adequately plead deliberate indifference in the context of his failure to train claim.

### iii. Failure to Supervise

The proposed SAC also does not state a *Monell* claim under a failure to supervise theory. Failure to supervise may be established where a decisionmaker "deliberately ignored an obvious need for supervision." *Id.* at 127–28. There are two ways a plaintiff can plausibly plead deliberate indifference with respect to failure to supervise claims:

> First, a plaintiff may plead (1) that there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that the municipality *consistently failed to investigate* those allegations. Second, a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality *consistently failed to discipline* those involved.

*See Tieman*, 2015 WL 1379652, at *21 (emphasis in original). Inherent in both iterations of the theory — whether labeled as a "failure to investigate" or a "failure to discipline" — is that the municipality had notice of actual or alleged wrongdoing within its government and did not act. *See Connick*, 563 U.S. at 61. For instance, in *Amnesty America*, the Second Circuit found that the need for supervising officers' use of force was "glaringly obvious," *i.e.*, that the city had constructive notice of the need, where the city's police chief "not only observed, but actively encouraged and supervised some of the allegedly brutal treatment of the arrestees, including 'yank[ing]' one arrestee's head up by the hair, and failing to intervene as another protester's face was pressed to the floor while an officer put a knee into her back." 361 F.3d at 127–28.

By contrast, the Proposed SAC neither pleads "a pattern of allegations of . . . similar unconstitutional activity," nor "a pattern of actual similar constitutional violations," sufficient to have put Yonkers on notice of Koch's constitutionally infirm warrant applications. *See Tieman*,

2015 WL 1379652, at *21; *cf Calderon v. City of New York*, 138 F. Supp. 3d 593, 612 (S.D.N.Y. 2015), *on reconsideration in part*, No. 14 CIV. 1082 (PAE), 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015) ("prior complaints are relevant insofar as they may put a municipality on notice of possible or actual constitutional violations."). Accordingly, Plaintiff fails to adequately allege that Yonkers was deliberately indifferent to a need to supervise.

Furthermore, Plaintiff's *Monell* claim is futile as the Proposed SAC fails to allege a causal link between Yonkers' training and/or supervision and Plaintiff's injuries. *See Amnesty Am.*, 361 F.3d at 129–30. For municipal liability to attach, a plaintiff's injuries must have "occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor." *Id.* at 130. Thus, to demonstrate causation, a plaintiff must allege that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect[.]" *City of Canton*, 489 U.S. at 390. Here, assuming, *arguendo*, that Yonkers' failed to adequately train or supervise, the operative question is whether Plaintiff would have been wrongfully incarcerated if Yonkers properly trained its officers regarding the inclusion of reliable and truthful information in search warrant affidavits. *See id.*

The Proposed SAC alleges that Plaintiff's injuries resulted from Koch's false statements in the Search Warrant Affidavit, which Plaintiff claims are "attributable to the Narcotics Division's disregard for the adequate supervision and training of its detectives." (*See* Proposed SAC ¶¶ 92, 96). Defendants argue that Plaintiff fails to plead actual or proximate causation. (Def. Br. at 15–16).

Plaintiff does not adequately allege that his injuries were "actually caused" by Yonkers' failure to train or supervise. *See City of Canton*, 489 U.S. at 391. Although "the false statements by Koch in his Search Warrant Affidavit" precipitated Plaintiff's arrest, (Proposed SAC ¶ 97),

the Proposed SAC fails to connect Koch's perjury to Yonkers' lack of training and/or supervision. *See Simms*, 2011 WL 4543051, at \*3. Put another way, the causation alleged in the Proposed SAC is premised "on . . . the mere fact that the misconduct occurred in the first place," which is insufficient to survive a motion to dismiss. *See Amnesty Am.*, 361 F.3d at 130.

At the outset, certain boilerplate allegations in the Proposed SAC regarding causation, which are untethered to supporting facts, are too conclusory to be considered on a motion to amend. *See Tieman*, 2015 WL 1379652, at \*14 (declining to accept as true conclusory accusations unsupported by facts that would permit the court to infer that city policies caused the alleged constitutional violation); (*see* Proposed SAC ¶¶ 92–96, 99).

Furthermore, the Proposed SAC's nonconclusory allegations, taken as true, do not allege the requisite nexus between the City's training and Koch's perjury to show that the former "actually caused" the latter. *See City of Canton*, 489 U.S. at 391. Plaintiff's most effective allegation is of Koch's statement that he did not know that his representations on warrant affidavits were sworn. (Proposed SAC ¶ 80). However, Koch's misimpression regarding the integrity of a search warrant affidavit, alone, fails to plausibly allege actual causation in the instant circumstances. *See Amnesty Am.*, 361 F.3d at 129. Here, the form warrant affidavit used by the YPD provides, immediately following the space where the affiant enters their name, that the affiant is "duly sworn and deposed." (Proposed SAC ¶ 80). Thus, Koch's statement that he did not know that affidavits were sworn does not support the inference that further training on the obligation to be truthful — which was written on the affidavit itself — would have prevented Koch from including falsehoods in the Search Warrant Affidavit.

Moreover, a plaintiff must allege that the responsible officer's wrongdoing "resulted from a faulty training program rather than from the negligent administration of a sound program or

other unrelated circumstances." *See Amnesty Am.*, 361 F.3d at 129–30 (internal quotations and alternations omitted). The Proposed SAC does not include such allegations. In fact, the Proposed SAC does not allege that any other YPD officer was unaware of the fact that search warrant applications were "duly sworn and deposed," which tends to support the inference that Koch's wrongdoing resulted from circumstances unrelated to Yonkers' training program.

Regardless, Plaintiff does not sufficiently allege that Yonkers' purported failure to train or supervise its officers on warrant application procedures proximately caused his injuries. "To prevail in a § 1983 action, the plaintiff must prove that the defendant's unlawful actions were the proximate cause of his injuries." *Urbina v. City of New York*, No. 14 Civ. 9870 (PAC), 2016 WL 79991, at *2 (S.D.N.Y. Jan. 6, 2016). Section 1983 litigation borrows proximate causation principles from the common law. *See Townes v. City of New York*, 176 F.3d 138, 147–48 (2d Cir. 1999). Consequently, a municipal defendant will not be liable for its wrongdoing if an intervening "'superseding cause' . . . breaks the legal chain of proximate cause." *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 161 (S.D.N.Y. 2009). "An intervening act may break the causal nexus when it is 'extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct.'" *Zahrey v. City of New York*, Civil Action No. 98–4546 (DCP)(JCF), 2009 WL 1024261, at *4 (S.D.N.Y. Apr. 15, 2009) (quoting *Derdiarian*, 434 N.Y.S.2d at 169).

In the instant matter, Koch's perjury was a superseding cause of Plaintiff's injuries.[6] Since Koch's obligation to truthfully complete warrant affidavits "is obvious to all" without supervision or training, *see Walker*, 974 F.2d at 300, it was not foreseeable to Yonkers that its

---

[6] The Court disagrees with Defendants' contention that Plaintiff's guilty plea was a superseding cause of his injuries. That an accused would plead guilty to a charge in exchange for a lesser sentence is not "extraordinary under the circumstances" and is "foreseeable in the normal course of events." *See Zahrey*, 2009 WL 1024261, at *4 (quoting *Derdiarian*, 434 N.Y.S.2d at 169).

failure to specifically instruct Koch that affidavits are sworn documents would cause Koch to sponsor false affidavits, *see Deskovic*, 673 F. Supp. 2d at 161. This is especially true in light of the fact that the form affidavit used by Yonkers provided that the affiant was "duly sworn and deposed." (Proposed SAC ¶ 80).

In sum, the Proposed SAC fails to articulate that Yonkers' alleged inadequate training or supervision was the actual or proximate cause of Plaintiff's injuries. Accordingly, Plaintiff's failure to train and failure to supervise theories of *Monell* liability are futile.

## 3. Municipal Custom or Usage

The Proposed SAC alternatively alleges that "[t]he Police Officer Defendants' illicit and criminal police investigations were so persistent and widespread" as to "constitute[] a policy and custom of which constructive knowledge can be implied on the part of the policymaking officials." (Proposed SAC ¶ 94). Defendants allege that Plaintiff has not plead a permanent or well-settled pattern of YPD officers submitting infirm warrant affidavits, such that a custom or usage is established. (Def. Br. at 8). In support of this assertion, Defendants highlight that the Proposed SAC "does not identify a single specific incident of alleged unconstitutional activity that related to a YPD officer other than . . . Koch." (*Id.* at 9).

The Court agrees with Defendants. Plaintiff does not identify unconstitutional actions taken by officers other than Koch or Molina. Allegations with respect to two officers are insufficient to show a "custom or usage" of swearing out infirm warrant affidavits. *Cf Bowles v. New York City Transit Auth.*, No. 00 Civ. 4213 (BSJ) (MHD), 03 Civ. 3073 (BSJ) (MHD), 2006 WL 1418602, at *16 n.31 (S.D.N.Y. May 23, 2006) ("combined evidence of only two" incidents of wrongdoing by separate government employees "would still be insufficient to show a 'custom or usage' under the *Monell* standard."). Pleadings articulating only isolated instances of

unconstitutional behavior do not plausibly allege a well-settled custom. *See Fowler v. City of New York*, 13-CV-2372(KAM)(ST), 2019 WL 1368994, at *9 (S.D.N.Y. Mar. 26, 2019). Relatedly, Plaintiff's conclusory allegations of wrongdoing within YPD's narcotics division does not establish that Yonkers had constructive notice of such wrongdoing, required to establish a custom. Accordingly, Plaintiff fails to plead that Yonkers acquiesced to a custom or usage of illicit search warrant applications. In sum, Plaintiff's theories of municipal liability advanced in the Proposed SAC are insufficient to survive a motion to dismiss. Therefore, the Proposed SAC is futile.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to file his SAC is denied. The Clerk is respectfully requested to terminate the pending motion (Docket No. 172).

Dated:  June 21, 2021
        White Plains, New York

                        **SO ORDERED:**

                        JUDITH C. McCARTHY
                        United States Magistrate Judge