UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

BRIAN D. PETTIFORD,

                Plaintiff,

        -against-

THE CITY OF YONKERS, YONKERS POLICE OFFICER
VINNIE DEVITO, YONKERS POLICE OFFICER DENNIS
MOLINA #646, YONKERS POLICE OFFICER CHRISTIAN
KOCH #699, ALL DEFENDANTS INDIVIDUALLY AND
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF
THE CITY OF YONKERS,

                Defendants.

-------------------------------------------------------------------------X

**OPINION AND ORDER**

14 Civ. 6271 (JCM)

      Plaintiff Brian D. Pettiford ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

against Defendants The City of Yonkers ("Yonkers"), Yonkers Police Officer Vinnie Devito

("Devito"), Yonkers Police Officer Dennis Molina ("Molina"), and Yonkers Police Officer

Christian Koch ("Koch"), (collectively, "Defendants"), individually and in their official

capacities as employees of the City of Yonkers. (Docket Nos. 1, 152).  Plaintiff filed an amended

complaint on February 18, 2020 ("Amended Complaint"). (Docket No. 152).  Defendants moved

for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion").[1]

(Docket No. 223).  Plaintiff opposed the Motion, (Docket No. 232), and Defendants replied,

(Docket No. 233).  For the reasons set forth below, Defendants' Motion is denied in its entirety.

## I.  BACKGROUND

      This civil rights action concerns the events leading up to Plaintiff's arrest by the Yonkers

---

[1] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c).
(Docket No. 21).

Police Department ("YPD") on March 22, 2012, and challenges his resulting prosecution. (Docket No. 152). The following facts are gathered from Defendants' Rule 56.1 Statement of Material Facts, (Docket No. 225), Plaintiff's Counterstatement to Defendants' Rule 56.1 Statement, (Docket No. 231),[2] and the exhibits annexed thereto.[3] The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Wandering Dago, Inc. v. Destito*,

---

[2] When facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and denied by only a conclusory statement without citation to conflicting testimonial or documentary evidence, the Court deems such facts true. *See Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, 15-CV-03363(NSR), 2018 WL 2416568, at *1, n.1 (S.D.N.Y. May 29, 2018); S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted . . ."); S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

In his response, Plaintiff denies certain statements but does not identify any actual factual inconsistency. For example, Plaintiff states the following numerous times: "Plaintiff denies that paragraph [X] of Defendants' Statement of Facts contains 'material facts.'" (*See, e.g.*, Docket No. 231 ¶¶ 7-18). These responses neither admit nor deny the facts at issue and do not identify a true factual dispute. Accordingly, the Court treats these statements as undisputed. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 408, n.1 (S.D.N.Y. 2017).

Furthermore, on numerous occasions, Plaintiff failed to comply with the S.D.N.Y.'s local rules and this Court's individual rules because his Counterstatement "improperly interject[s] arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts." (*See, e.g.*, Docket No. 231 ¶¶ 36, 39, 44, 45); *see Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014). Those responses contain "argumentative and often lengthy narrative" which tries to "'spin' the impact of the admissions [P]laintiff has been compelled to make," resulting in a 50-page Counterstatement, which is essentially "a manifest evasion of the page limitation on [P]laintiff's memorandum in opposition to the motion for summary judgment." *See Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002). Accordingly, the Court disregards these portions of Plaintiff's Counterstatement. *See Ifudu v. City of New York*, No. 16-CV-2957(MKB), 2018 WL 4568799, at *4 (E.D.N.Y. Sept. 24, 2018) ("The Court will… disregard responses containing legal argument or nonresponsive narrative."); *see also Abusikin v. City of New York*, No. 18-CIV-4582(AT), 2021 WL 930349, at *1, n.1 (S.D.N.Y. Mar. 11, 2021) (internal citations omitted) (striking the portions of plaintiff's counterstatement that had argumentative and lengthy narrative).

In several instances, Plaintiff begins his response by stating "not disputed," but then wrongly "assert[s] facts that attempt[] to either undermine Defendant's asserted fact or deny an implication of that asserted fact," either directly in the response or by incorporating by reference a response to another paragraph of Defendants' Statement of Facts. (*See, e.g.,* Docket 231 ¶¶ 123-126, 128-142); *see Snyder v. Town of Potsdam*, No. 7:16-CV-1462(GTS)(TWD), 2018 WL 6267922, at *1, n.1 (N.D.N.Y. Nov. 30, 2018). The Court will consider all such statements as undisputed, since Plaintiff's initial response is "not disputed." *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2); *see also CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2, n.3 (E.D.N.Y. Apr. 8, 2015).

[3] Whereas the Court need only consider the cited materials in a Rule 56.1 statement, the Court may also rely on evidence in the record even if uncited. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014); Fed. R. Civ. P. 56(c)(3).

879 F.3d 20, 30 (2d Cir. 2018). The facts set forth herein are not in dispute, unless otherwise noted.[4]

## A.  Plaintiff's Background

Plaintiff admittedly sold drugs on the streets of the City of Yonkers from the time he was a teenager until the underlying arrest. (Docket No. 225 ¶ 7; Docket No. 231 ¶ 7; Docket No. 224-2 at 45:5-47:1, 159:11-23).  From November 2002 through March 2012, Plaintiff was arrested several times for criminal possession or criminal sale of controlled substances, criminal possession of a weapon, and failure to appear in court. (*See* Docket No. 225 ¶¶ 8-11, 14-15, 18; *see* Docket No. 231 ¶¶ 8-11, 14-15, 18).

## B.  480 South Broadway

On March 22, 2012, Defendants executed a search warrant at the basement apartment of 480 South Broadway, Yonkers, New York ("480 South Broadway"). (Docket No. 152 ¶¶ 19-21; Docket No. 170 ¶¶ 19-21; Docket No. 225 ¶¶ 94, 109; Docket No. 231 ¶¶ 94, 109).  Plaintiff testified that this apartment belonged to Miriam Nmair ("Ms. Nmair), the mother of his two children. (Docket No. 225 ¶ 19; Docket No. 231 ¶ 19).  480 South Broadway had a red front door, (Docket No. 225 ¶ 24; Docket No. 231 ¶ 24), and a door to the basement area that separated the basement apartment from the rest of the building, (Docket No. 225 ¶ 27; Docket No. 231 ¶ 27).  After someone tried to break into the basement apartment in December 2011, Plaintiff installed a bar, which he referred to as a "police lock," on the door to the basement area. (Docket No. 225 ¶ 28; Docket No. 231 ¶ 28).

---

[4] The publicly filed versions of the depositions of Molina and Koch, (Docket Nos. 224-5, 224-6, 224-7), contain redactions of information designated by Defendants as confidential.  Many of the parties' exhibits are also filed under seal. (Docket Nos. 227 and 229).  The publicly filed version of this Opinion and Order includes only information that the Court deems not confidential. (Docket Nos. 224, 225, 226, 228, 230, 231, 232, 233, 234).

Plaintiff was often alone in the apartment with the kids when Ms. Nmair went to school or work. (Docket No. 225 ¶ 20; Docket No. 231 ¶ 20).  He kept clothes and a toothbrush at the apartment but claims that he never stored any drugs or money there. (Docket No. 225 ¶¶ 30, 33; Docket No. 231 ¶¶ 30, 33).

Ms. Nmair provided Plaintiff with the code to the red front door of 480 South Broadway that gave him full access to the apartment. (Docket No. 225 ¶¶ 25-26; Docket No. 231 ¶¶ 25-26). Plaintiff also had keys to the basement apartment, which he kept on a large key ring that included keys to the front door of the building. (Docket No. 225 ¶¶ 21-23; Docket No. 231 ¶¶ 21-23). Defendants assert that the key ring also included a key to a locked dresser drawer in the bedroom, (Docket No. 225 ¶¶ 23, 32), but Plaintiff disputes this, citing to Ms. Nmair's testimony that she owned the dresser drawer and never gave Plaintiff a key to it, (Docket No. 231 ¶¶ 23, 32).  Ms. Nmair explained that she had two keys to the dresser; she kept one of them and put the other one on the china set in her apartment. (Docket No. 231 ¶ 23; Docket No. 228-1 at 36:23-37:19).  Plaintiff further testified that Ms. Nmair told him that the key ring had "keys [that] go to everything," but that he never used the keys to open the dresser drawers. (Docket No. 224-2 at 53:11-55:13).

## C. YPD Narcotics Investigation

In early February 2012, the YPD's Narcotics Unit opened an investigation into the sale of marijuana from the basement apartment of 480 South Broadway. (Docket No. 225 ¶ 36).  Around this time, Koch and Molina were members of the YPD's Narcotics Unit. (Docket No. 225 ¶ 35; Docket No. 231 ¶ 35).  Molina testified that he had heard of Plaintiff, though he was not sure of the context, and Koch testified that he was aware that Plaintiff had a reputation for dealing drugs and possessing firearms. (Docket No. 225 ¶ 37; Docket No. 231 ¶ 37).  Both Molina and Koch

4

testified that when the investigation began, they knew that there was drugs and gang activity in the area around 480 South Broadway. (Docket No. 225 ¶ 38; Docket No. 231 ¶ 38).

## 1.  Confidential Informant 173 ("CI 173")

CI 173 worked with the YPD on at least four occasions prior to Plaintiff's arrest and was introduced to Molina by another member of the YPD. (Docket No. 225 ¶ 40).  Defendants claim that during their investigation of 480 South Broadway, they relied on CI 173,[5] who was "past, proven, and reliable." (*Id.* ¶ 39).  CI 173 informed Molina that Plaintiff was selling drugs from the basement apartment. (*Id.*).  Koch explained that CI 173 had been vetted and registered with the YPD, and was classified as past-proven. (Docket No. 221-3 at 139:9-140:6).  Molina testified that he was the contact with CI 173 and that Koch had no independent channel of communication with the CI because the CI only spoke Spanish. (Docket No. 231 ¶ 149; Docket No. 228-11 at 156:6-9; 249:12-19).  Defendants assert that they used CI 173 to conduct controlled buys from Plaintiff. (Docket No. 221-5 ¶ 44).  Defendants claim that prior to the first controlled buy, Molina and Koch showed CI 173 a photograph of Plaintiff from the R.I.C.I. system[6] and the CI identified Plaintiff from that photograph. (Docket No. 225 ¶¶ 42-43).  Defendants maintain that

---

[5] Plaintiff speculates without any factual basis that CI 173 was not involved in Defendants' investigation. (Docket No. 231 ¶ 39).  Plaintiff appears to base this on CI 173's testimony that he/she does not recall a man by the name of Brian Pettiford, nor did the CI recognize a photograph of Plaintiff when Investigator Salinas showed it to him/her. (*Id.*).  However, within this same response and throughout the Counterstatement, Plaintiff cites to evidence that indicates CI 173 was involved in the investigation and the controlled buys. (*Id.*).  For example, Plaintiff cites to CI 173's testimony that the "black man" handed him/her a bag of marijuana at street level from behind the front red door at 480 South Broadway. (*Id.*).  Plaintiff also cites CI 173's testimony that CI 173 was surprised that the "black man" at 480 South Broadway sold him/her marijuana instead of cocaine and when CI 173 returned to the police vehicle, he/she laughed with Molina and Koch that it was marijuana. (*Id.*).  Given that Plaintiff makes an unsupported allegation and cites to contradictory evidence, the Court does not credit Plaintiff's assertion that CI 173 was not involved in the YPD investigation of 480 South Broadway. *See Mapinfo Corp. v. Spatial Re-Eng'g Consultants*, No. 02-CV-1008(DRH), 2006 WL 2811816, at *13 (N.D.N.Y. Sept. 28, 2006) ("[The party's] unsupported speculation is insufficient to raise a question of material fact.").

[6] The R.I.C.I. network allows Westchester public safety agencies "to track persons arrested for crimes and share information including photographs, palm and fingerprint images, and pedigree information of these persons." *Shared Services and Programs*, WESTCHESTER GOVERNMENT PUBLIC SAFETY, https://publicsafety.westchestergov.com/about-us/shared-services-and-programs (last visited Sept. 27, 2022).

this was one factor in support of probable cause for the search warrant affidavit. (*Id.* ¶¶ 43). Plaintiff disputes that a photograph was shown to CI 173 prior to the controlled buy because the investigation file does not contain a copy of it, which was noted in the search warrant briefing that the WCDAO received from the YPD. (Docket No. 231 ¶ 42; Docket No. 229-6).  In addition, Plaintiff argues that CI-173's identification could not have been a factor in developing probable cause for the search warrant because CI 173 testified that he/she could not identify Plaintiff "because black people are all similar." (Docket No. 231 ¶ 43).

Defendants also maintain that they conducted surveillance in the area around 480 South Broadway and that Molina saw Plaintiff outside the building approximately three to five times. (Docket No. 225 ¶ 41).  Plaintiff claims there were no records indicating that any surveillance was conducted at 480 South Broadway during this investigation and that Koch's testimony on this point was inconsistent.  (Docket No. 231 ¶ 41).  Koch said that he remembered "two, if not three, but definitely two" times that members of the YPD set up surveillance there, but later clarified that he was referring to the two controlled buys. (*Id.*).

## 2.   The Controlled Buys

Defendants assert that in March of 2012, CI 173 made two controlled buys of marijuana from Plaintiff at 480 South Broadway. (Docket No. 221-5 ¶ 44).  However, Defendants explain that the exact dates of the controlled buys were not recorded in YPD paperwork, nor were they included in the search warrant, in order to protect the CI. (Docket No. 225 ¶ 45).  Plaintiff summarily disputes that the two controlled buys occurred. (Docket No. 231 ¶¶ 60-61).[7]  Molina testified that he was not sure of the date or time of the controlled buys. (Docket No. 231 ¶¶ 147-

---

[7] Although the Court does not credit Plaintiff's allegation that CI 173 was not involved in the investigation at all, issues of fact exist regarding the extent of the CI's involvement and whether the controlled buys occurred before or after the search warrant was executed and submitted.

148).  Koch stated in his search warrant affidavit that the two controlled buys occurred in the second week of March 2012 and that he recorded the dates on the Investigative Fund Receipts as March 13 and March 16, 2012. (Docket No. 231 ¶¶ 44-45, 212, 215, 218).  Plaintiff rebuts this assertion with Detective Koch's own testimony that the dates in the Investigative Fund Receipts were when he requested reimbursement, but that he did not recall the actual dates of the controlled buys. (*Id*. ¶¶ 215-216).  Detective Koch also testified that he believes the entries in the Investigative Fund Receipts were all filled out on the same day because they were all written with the same pen in the same way, and that "the dates don't mean anything." (*Id*. ¶ 217; Docket No. 228-9 at 256:6-18).  Plaintiff also cites to various records that undermine Defendants' claim that the controlled buys occurred in the second week of March 2012. (Docket No. 228-6; Docket No. 228-14; Docket No. 228-15; Docket No. 228-16; Docket No. 229-21; Docket No. 231 ¶¶ 44, 226).  According to those records, on the week in question, Koch and Molina were off duty on Sunday and Monday, were out on disability Wednesday and Thursday as a result of an altercation with an arrest made on Tuesday, were working on other investigations on Friday, and were off duty on Saturday. (*Id*.).

Defendants assert that prior to conducting each controlled buy, Molina and Koch met with CI 173 in their vehicle near 480 South Broadway to give instructions and search the CI to make sure the CI did not have contraband. (Docket No. 221-5 ¶¶ 46-47).  Defendants then gave CI 173 money from the YPD investigative fund for the purchase of drugs and in payment for his/her services. (Docket No. 221-5 ¶ 48).  Plaintiff points to CI 173's testimony that neither Koch nor Molina ever searched him/her or asked whether he/she had any drugs or contraband. (Docket No. 231 ¶¶ 47-48).

According to Defendants, after being given the money, CI 173 exited the car and entered 480 South Broadway through the red front door, which Koch and Molina observed. (Docket No. 221-5 ¶ 49).   Koch and Molina waited at a pre-arranged location, and CI 173 returned with the marijuana he/she purchased, and told Detective Molina that he/she bought the marijuana from Plaintiff. (*Id*.; Docket No. 221-1 at 102:17-22).   Koch and Molina met with CI 173 for a second controlled buy at 480 South Broadway, again patting down him/her for contraband. (Docket No. 221-5 ¶ 50).   The CI returned with the marijuana he purchased and advised them that he/she purchased it from Plaintiff at the basement apartment. (*Id*.; Docket No. 221-1 at 118:14-16).

Defendants assert that after each controlled buy in this investigation, the purchased evidence was vouchered on a DD-9 form, logged into the CI logbook, and placed into a sealed envelope. (Docket No. 225 ¶ 51; Docket No. 224-11).   The evidence was secured in the Narcotics Unit safe until someone took it to the lab — it was not uncommon for drugs to be taken to the lab on a later date, in part, to protect the identity of the CI. (*Id*. ¶ 53).   Defendants further explained that the exact dates of controlled buys were often not recorded to protect the identity and safety of the CI. (*Id*. ¶ 52).   However, Plaintiff cites to evidence indicating that the YPD Narcotics Unit had stringent policies regarding promptly logging evidence with correct dates, including recording evidence chronologically into the Evidence Log the same day of the buy. (Docket No. 231 ¶¶ 52, 222, 224).   Here, the evidence shows that the drugs from the controlled buys were not property clerked until after the March 20, 2012 search warrant application was submitted. (*Id*. ¶ 51).   For example, the Evidence Log shows that the two ten-dollar bags of marijuana purchased by CI 173 during the controlled buys were not recorded until March 22, 2012. (*Id*. ¶ 221).   Additionally, the money used to pay the CI was not recorded in the CI logbook until March 21, 2012, the day after the search warrant was executed. (Docket No.

221-5 ¶ 48; Docket No. 228-3 at 87:11-14; Docket No. 228-5; Docket No. 231 ¶¶ 48, 220).

Plaintiff also points out that Detective Sergeant Bock ("Bock") and Cleary testified that

significant investigation events, like controlled buys, would be documented in narrative form on

an incident report. (Docket No. 231 ¶¶ 227-28).   However, there is no narrative description of the

controlled buys in the investigative file here and the only incident report was generated after the

execution of the search warrant. (*Id*. ¶¶ 230-31).

### 3.   Search Warrant Application

Molina initiated the investigation and received the information from CI 173. (Docket No.

225 ¶ 55; Docket No. 228-10 at 154:24-156:12; Docket No. 231 ¶¶ 151-52).   However, Koch

drafted the search warrant and affidavit for 480 South Broadway based on information provided

to him by Molina because Koch was better at writing search warrants, and Molina was "not the

best typer." (Docket No. 231 ¶ 152; Docket No. 228-37 at 124:22-125:04).   Koch testified that

when he filled out the search warrant affidavit form, he did not know what an affidavit was and

did not understand that he was under oath.   (Docket No. 228-9 at 87:24-88:25, 91:14-92:14;

Docket No. 231 ¶¶ 161, 166-67).[8]

The search warrant affidavit stated that Koch "received information that marijuana was

being sold from within 480 South Broadway, Apartment Number Basement, Yonkers, New

York, by a black male known as Brian Pettiford." (Docket No. 225 ¶ 55).   In the affidavit, Koch

inaccurately claimed that the CI who made the controlled buys was previously used by the YPD

in two specific arrests. (Docket No. 221-5 ¶ 57; Docket No. 231 ¶¶ 57-58; Docket No. 224-13 at

---

[8] Plaintiff spends significant time in his Counterstatement discussing Koch's and Molina's lack of training, particularly regarding the probable cause needed to support a search warrant. (*See* Docket No. 231 ¶¶ 159-80). However, this Court has already denied Plaintiff's motion to amend his complaint to add a *Monell* claim against the City of Yonkers based on failure to train. (*See* Docket No. 151 at 15-17).   Accordingly, facts regarding Defendants' lack of training are not material to the pending motion.

5).  Koch also falsely stated in the affidavit that the evidence was sent to the lab for testing prior to the application for the search warrant. (Docket No. 225 ¶ 63; Docket No. 231 ¶ 63).  In fact, the evidence shows that it was not sent until March 29, 2012, nine days after the search warrant was submitted. (Docket No. 225 ¶¶ 63-64; Docket No. 231 ¶ 63).  Defendants assert that even prior to the evidence from the controlled buys being tested in the lab, Koch believed it to be marijuana based on his training and experience. (Docket No. 225 ¶ 64).

On March 20, 2012, Koch submitted the search warrant application for 480 South Broadway to the Honorable Judge Daly of the Yonkers City Court, who signed the search warrant the same day. (Docket No. 225 ¶¶ 65-66; Docket No. 231 ¶¶ 65-66, 155).  The search warrant was executed at 480 South Broadway on March 22, 2012. (Docket No. 231 ¶ 158).

**4.   March 22, 2012 Search of 480 South Broadway**

On March 22, 2012, at approximately 6:30 or 7:00 a.m., Plaintiff went to the apartment at 480 South Broadway to take care of his children. (Docket No. 225 ¶ 67; Docket No. 231 ¶ 67).  Throughout the day, Plaintiff was alone in the apartment with his children. (Docket No. 225 ¶ 68; Docket No. 231 ¶ 68).  Plaintiff had his key ring with him, with the keys to the 480 South Broadway apartment on it. (Docket No. 225 ¶¶ 69-70; Docket No. 231 ¶¶ 69-70).  The parties dispute whether the key ring included the key to the locked dresser in the bedroom. (Docket No. 225 ¶ 69; Docket No. 231 ¶ 69).  A little after 3:00 p.m., Ms. Nmair arrived home and told Plaintiff that she wanted to take the children outside because it was a nice day. (Docket No. 225 ¶ 71; Docket No. 231 ¶ 71).  At first, Plaintiff intended to accompany Ms. Nmair and the children, but since he did not "have much money," he decided to "try to make some" by selling drugs. (Docket No. 225 ¶¶ 72, 83; Docket No. 231 ¶ 72).  When he initially left the apartment, Plaintiff walked with Ms. Nmair and the children, but he realized he forgot something and told

Ms. Nmair that he would join her at the park. (Docket No. 225 ¶ 77; Docket No. 231 ¶ 77).

Plaintiff returned to the building and exited again at approximately 3:30 p.m. (Docket No. 225 ¶ 81; Docket No. 231 ¶ 81).  Plaintiff had marijuana with him, which he kept in a pouch clipped to his belt. (Docket No. 225 ¶¶ 78, 82, 84; Docket No. 231 ¶ 78).  The marijuana was separated into around twenty, possibly twenty-six, little bags ready to be sold. (Docket No. 225 ¶ 82; Docket No. 224-2 at 98:1-18).  Plaintiff walked to the front of the barbershop, and after waiting there for approximately six to ten minutes for his friend to pick him up, he noticed an undercover car pull up. (Docket No. 225 ¶¶ 85-86).  Plaintiff started to walk off, but he did not run because he did not believe he had any warrants "or anything for anyone to run after [him or] to search [him]." (*Id*. ¶¶ 88-89; Docket No. 231 ¶¶ 88-89).

The parties dispute what happened next.  Defendants claim that Molina and Koch were in the area near 480 South Broadway and observed Plaintiff exit the building with Ms. Nmair and the children, and then saw him return to the building alone. (Docket No. 225 ¶¶ 75-76).  Koch and Molina called the YPD warrant team, who were waiting nearby in unmarked cars, to respond to 480 South Broadway. (Docket No. 224-5 at 144:11-15; Docket No. 225 ¶ 80).  The warrant team consisted of Detectives Cleary, Bock, Mueller, Starkey, Hanrahan, Fogarty, Mullen and Higgins, and Officers Colon, Mullin, Braig, Cooper, and Donahue.  (*Id*. ¶ 79).  Molina and Koch approached Plaintiff when he was in front of the barbershop and advised him that they had a search warrant for the basement apartment at 480 South Broadway. (Docket No. 225 ¶ 87).  Plaintiff was asked whether he had any weapons or contraband on him, to which Plaintiff replied that he was in possession of marijuana. (*Id*. ¶ 90).  Molina recovered the marijuana from Plaintiff and handcuffed him. (*Id*. ¶¶ 91-92).  Molina also confiscated a set of keys which he found on Plaintiff when he searched him. (*Id*. ¶ 92).  Plaintiff was then placed into a YPD vehicle. (*Id*. ¶

93).  Plaintiff asserts, on the other hand, that it was Devito who stopped, detained and arrested

him, and who told him that he had a warrant and placed him in the back seat of his patrol car.

(Docket No. 228-2 at 104:17-111:7; Docket No. 231 ¶¶ 75, 87, 90-92).

Officers from the warrant team then entered 480 South Broadway, cleared the apartment

to confirm that no one was there, and conducted a search. (Docket No. 225 ¶ 94; Docket No. 231

¶ 94).  Defendants contend that Detective Fogarty ("Fogarty"), Detective Hanharan

("Hanharan"), and Molina went to search the bedroom, with Fogarty searching the dresser and

Molina searching the rest of the bedroom. (Docket No. 225 ¶¶ 95-96).  Fogarty and Hanharan

used a key from Plaintiff's key ring to open the locked drawer on the dresser, and found a Ruger

.40 caliber handgun with ten live rounds in the magazine. (*Id*. ¶ 97).  Molina was present when

Fogarty and Hanharan discovered the handgun. (*Id*. ¶ 98).  The detectives also found packaging

material that is commonly used to package crack cocaine or marijuana, as well as a calculator

and bottles with pills in them but no prescription. (*Id*. ¶ 99).  Either Detective Mueller or

Detective Cassino ("Cassino") found 64 bags of marijuana in the kitchen refrigerator. (*Id*. ¶ 101;

Docket 227-1 at 31:7-33:5; Docket No. 224-5 at 180:2-13).  Hanharan found a purple plastic box

that contained several boxes of ammunition and a gun cleaning kit. (Docket No. 225 ¶ 104).

Plaintiff argues that this recapitulation is not accurate because it was Devito who searched the

building, and returned to the car and showed Plaintiff the gun he claimed he found in the

apartment. (Docket No. 231 ¶¶ 75, 95).  In support of his position, Plaintiff points to Fogarty's

testimony that he does not recall being in the bedroom when the gun was found. (*Id*. ¶ 95).

Officer Burlingham from the Crime Scene Unit responded and processed the crime scene

and the handgun. (Docket No. 225 ¶ 106; Docket No. 231 ¶ 106).  He took DNA swabs from the

trigger, grip and slide of the gun. (Docket No. 225 ¶ 108; Docket No. 231 ¶ 108).  The narcotics

and other physical evidence found was property clerked at the YPD Narcotics Office. (Docket No. 225 ¶¶ 103, 107; Docket No. 231 ¶ 107).  Plaintiff was subsequently arrested and taken to the YPD. (Docket No. 225 ¶ 109; Docket No. 231 ¶ 109).

Thereafter, Molina and Koch informed Ms. Nmair that YPD executed a search warrant on her apartment and found a gun. (Docket No. 225 ¶ 110).  Defendants assert that Ms. Nmair willingly came with Koch to the YPD where she provided a sworn statement. (*Id*. ¶¶ 110-11).  However, Plaintiff disputes that Ms. Nmair went willingly. (Docket No. 231 ¶ 34).  Rather, Plaintiff cites to Ms. Nmair's deposition testimony that Koch and Molina coerced her into signing the statement, threatening that "if [she] didn't sign this, [she was] going to jail" and "[her] kids [we]re going to be taken away." (Docket No. 231 ¶¶ 34, 110-11; Docket No. 228-1 at 76:3-14, 83:25-84:14).  In the sworn statement, Ms. Nmair purportedly referred to the basement apartment as "my children father's and my apartment." (Docket No. 225 ¶ 34; Docket No. 224-4).  Ms. Nmair also allegedly indicated that though Plaintiff never told her that he had a gun and she never saw it before, she "assum[ed] that [Plaintiff] got the handgun because of the attempted robbery" in December of 2011 "for [their] protection." (Docket No. 225 ¶ 112).

Ms. Nmair testified that when she opened the dresser drawers on March 22, 2012, there was nothing in them except for money. (Docket No. 231 ¶ 95*)*.  Plaintiff testified that to his knowledge, Ms. Nmair did not own a gun or sell or use drugs. (Docket No. 225 ¶¶ 100, 102; Docket No. 231 ¶¶ 100, 102).  Defendants cite to Plaintiff's testimony that before he was arrested on March 22, 2012, he did not see bullets or marijuana anywhere in the apartment or in the refrigerator. (Docket No. 225 ¶ 105; Docket No. 231 ¶ 105).

On March 23, 2012, Molina signed and executed the felony complaint in Yonkers City Court, charging Plaintiff with criminal possession of a weapon in the third degree. (Docket No.

225 ¶ 113; Docket No. 231 ¶¶ 113, 181).  Plaintiff was also charged with criminal possession of

a controlled substance in the seventh degree and unlawful possession of marijuana. (Docket No.

234-1).  Plaintiff was arraigned the following day. (Docket No. 225 ¶ 113; Docket No. 231 ¶

113).  Plaintiff requested a felony hearing, which was conducted on April 16, 2012.  (Docket No.

225 ¶ 114; Docket No. 231 ¶ 114).  Judge Daly found that there was sufficient evidence to hold

the case for the action of the Grand Jury. (*Id*.).  At the Grand Jury, Plaintiff was represented by

his attorney, Brendan O'Meara ("O'Meara"), and given the opportunity to testify. (Docket No.

225 ¶¶ 115-17; Docket No. 231 ¶¶ 115-17).  Plaintiff was subsequently indicted by the Grand

Jury for criminal possession of a weapon in the third degree, criminal possession of a controlled

substance in the seventh degree, and unlawful possession of marijuana. (Docket No. 224-19;

Docket No. 225 ¶¶ 123-24; Docket No. 231 ¶¶ 123-24).  On June 3, 2012, Plaintiff posted bail

and was released. (Docket No. 225 ¶ 126; Docket No. 231 ¶ 126; Docket No. 224-2 at 132:13-

134:13).[9]

On November 28, 2012, Plaintiff pleaded guilty to the crime of attempted criminal

possession of a weapon in the third degree before Judge Robert Neary and was remanded to the

Westchester County Jail to await sentencing. (Docket No. 225 ¶¶ 127-28, 135).  "During the

plea, Judge Neary stated that the agreed upon sentence was one and a half to three years," which

ADA Braca Santos and O'Meara confirmed. (*Id*. ¶ 129).  At sentencing on January 3, 2013,

---

[9] The Assistant District Attorney ("ADA") who prosecuted Plaintiff was Paula Braca Santos ("Braca Santos"). (Docket No. 231 ¶ 242).  During Plaintiff's prosecution, Braca Santos made several contemporaneous notes in the normal and usual course of her duties. (*Id*. ¶¶ 186, 188).  On October 25, 2012, she noted "Detective Koch informed me that there have been too many instances of CI's getting burned, so he is not inclined to produce the CI for the Darden Hearing." (*Id*. ¶ 189).  Braca Santos explained that "getting burned" means that the CI's identity would be revealed and they could not be used as a CI anymore. (*Id*. ¶ 191).  On November 27, 2012, she wrote that the "YPD will not produce CI as per Detective Koch." (*Id*. ¶ 186).  Based on these notes, Braca Santos testified that it was her understanding that it was Koch who advised her that he would not produce CI 173 for a Darden Hearing. (*Id*. ¶¶ 187, 190).  Koch testified that he would have had to get permission from Bock or Cleary to produce the CI, and Bock confirmed that Koch did not have the authority to refuse to produce the CI for such a hearing. (*Id*. ¶ 193; Docket No. 228-3 at 168:16-170:19; Docket No. 228-9 at 199:6-9).

Judge Neary found that Plaintiff was a predicate felon, and as such, sentenced him to an indeterminate sentence of one and one half to three years. (*Id*. ¶ 139).

**5. Westchester County District Attorney's Office's Public Integrity Investigation and the Vacatur of Plaintiff's Conviction**

On April 23, 2015, Koch pleaded guilty to perjury in the second degree in connection with a March 21, 2014 search warrant affidavit in an unrelated matter. (Docket No. 224-13 at 1; Docket No. 225 ¶ 140; Docket No. 231 ¶¶ 200-01). Thereafter, the Westchester County District Attorney's Office ("WCDAO") conducted a public integrity investigation of the YPD, a component of which was a post-conviction review of five narcotics search warrant affidavits sworn to by Koch between December 2010 and March 2012. (Docket No. 231 ¶¶ 202-03; Docket No. 220-13 at 2). ADA Fitzgerald ("Fitzgerald") was the point person for this investigation. (Docket No. 231 ¶ 204). Investigator Salinas ("Salinas"), assisted Fitzgerald and interviewed the confidential informants used by Koch on these five cases. (*Id*. ¶¶ 206-07).

As a result of this public integrity investigation, the WCDAO determined that Koch "swore to five narcotics search warrant affidavits containing statements of fact in conflict with the records of the Yonkers Police Department and the Yonkers Forensic Laboratory," and that there were issues of credibility in these search warrants. (*Id*. ¶¶ 194-95, 234-36; Docket No. 220-13 at 2). One of the five search warrant affidavits sworn to by Koch related to Plaintiff's arrest and prosecution in the underlying criminal matter at issue here. (Docket No. 224-13 at 1). The WCDAO determined that CI 173 was not involved in one of the prior arrests that Koch stated CI 173 was proven reliable as that arrest was attributable to a different CI. (*Id*. at 5; Docket No. 225 ¶ 141; Docket No. 231 ¶ 196). The WCDAO also noted that although Koch claimed that the evidence from the two controlled buys was properly clerked and transported to the YPD Forensic Laboratory for further analysis prior to the search warrant application, other YPD records

indicated that the alleged evidence was only received by the laboratory on March 29, 2012, days after the warrant was executed and submitted to the court. (Docket No. 225 ¶ 141; Docket No. 231 ¶¶ 197, 244-45).  The fact that the evidence was not logged into the YPD Forensic Laboratory until nine days after the search warrant was executed was a factor in Fitzgerald's determination that there was a lack of foundation for probable cause for the search warrant. (Docket No. 231 ¶ 246).  The WCDAO found that these discrepancies in the search warrant affidavit considered in light of Koch's perjury conviction raised "a serious question as to the survivability of [Plaintiff's] conviction." (Docket No. 228-21 at 5; Docket No. 231 ¶ 198).  As a result, on May 10, 2018, the WCDAO informed Plaintiff's criminal attorney of its intent to vacate Plaintiff's conviction pursuant to CPL § 440.10. (Docket No. 225 ¶ 143; Docket No. 231 ¶¶ 142, 199).  In its affirmation in support of the anticipated motion, the WCDAO stated that "a court-ordered CPL 440 hearing in the matter would be futile [since it] would necessarily involve former Detective Koch as a principal witness; a witness whom the People will not rely on either at a hearing or a prospective trial in this matter." (Docket No. 231 ¶ 205).  On May 23, 2018, Westchester County Supreme Court Judge Barry Warhit granted the WCDAO's motion and vacated Plaintiff's conviction. (Docket No. 225 ¶ 145; Docket No. 228-21; Docket No. 231 ¶ 145).  Defendants maintain that the WCDAO did not exonerate Plaintiff, nor did it indicate that the evidence established that Plaintiff was wrongfully arrested or convicted. (Docket No. 225 ¶ 144).

During this investigation, Salinas interviewed CI 173 regarding his/her alleged work on the YPD investigation of 480 South Broadway. (Docket No. 231 ¶ 208).[10]  Salinas testified that

---

[10] Plaintiff points to Salinas' testimony regarding what the CI said in these interviews. (Docket No. 231 ¶¶ 209-10).  However, such testimony is hearsay and will not be considered by this Court. *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015), *aff'd sub nom*. *Abdel-Karim v. Egyptair Holding Co.*, 649 F. App'x 5 (2d Cir.

he is not aware of any facts that corroborate that the controlled buys ever occurred at 480 South Broadway during the YPD's investigation. (*Id*. ¶ 211). Fitzgerald explained that the investigation found that CI 173 had familiarity with the location of the controlled buys but "there was no definitive proof one way or the other that the controlled buy[s] happened on a specific date." (*Id*. ¶ 241; Docket No. 220-9 at 119:15-120:3, 121:11-18; 172:5-15; 173:2-7).

The WCDAO also publicly published a list of law enforcement officers whose courtroom testimony lacks credibility. (Docket No. 231 ¶ 232). Fitzgerald testified that he believed to the best of his knowledge that Molina's name was on this list. (*Id*. ¶ 233). Fitzgerald also noted in his internal investigation memorandum that Molina contacted CI 173 and suggested that he/she not cooperate with the WCDAO Public Integrity Investigation. (*Id*. ¶ 237).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)) (internal quotations omitted).

---

2016) ("A party 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... absent a showing that admissible evidence will be available at trial.'").

In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotations omitted).  However, the nonmovant cannot defeat a motion for summary judgment by relying on unsupported assertions, conjecture or surmise. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The nonmovant must also do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To survive a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).

## III.  DISCUSSION

### A.  False Arrest

Defendants argue that Plaintiff's false arrest claim fails as a matter of law because it is undisputed that Defendants had probable cause to arrest Plaintiff based on information from the CI's two controlled buys, Plaintiff's constructive possession of the gun, and the discovery of marijuana on Plaintiff's person. (Docket No. 226 at 9-14).  Plaintiff asserts, however, that genuine issues of fact preclude summary judgment on Plaintiff's false arrest claim because Defendants detained Plaintiff without probable cause and their entire investigation was a fraud. (Docket No. 232 at 11-14).

"To establish a false arrest claim, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the

plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Smith v. City of New York*, 388 F. Supp. 2d 179, 184 (S.D.N.Y. 2005). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). Moreover, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant," not "whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). Thus, "when faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge." *Id.* "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Id.*

Here, Defendants argue that they had probable cause to arrest Plaintiff based on the information provided to them by the past-proven and reliable confidential informant's two controlled buys. (Docket No. 226 at 12-13). "[I]nformation from a single confidential informant [] can be sufficient for a finding of probable cause, particularly when it is buttressed by other indicia of reliability." *Ribot v. City of New York*, No. 14 CIV. 190, 2017 WL 476715, at *3 (S.D.N.Y. Feb. 3, 2017). "It is reasonable to believe that an informant who has provided reliable information in the past will be reliable in the present." *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 222 (E.D.N.Y. 2007). Here, it is undisputed that CI 173 worked with the YPD on at least

four prior occasions, (Docket No. 225 ¶ 40), and Defendants claim that CI 173 was classified as past-proven by the YPD, (Docket No. 221-3 at 139:9-140:6).  Further, CI 173 allegedly participated in supervised drug purchases which "is powerful corroborative evidence for the purposes of determining probable cause." *Nelson*, 524 F. Supp. 2d at 222.

However, Plaintiff disputes that CI 173's two controlled buys involving Plaintiff ever occurred, pointing to CI 173's testimony that he/she did not make any controlled buys at the basement apartment but rather was handed a bag of marijuana at street level from behind the red front door. (Docket No. 232 at 12-13; Docket No. 231 ¶ 39).  Plaintiff also asserts that CI 173 did not know Plaintiff because he/she did not recognize him in a photograph shown by Salinas during the public integrity investigation and stated that "all black people are similar." (Docket No. 232 at 12-13; Docket No. 231 ¶¶ 39, 41, 42, 43).  Plaintiff further claims it was impossible for the controlled buys to occur in the second week of March 2012 as Defendants maintain because Koch and Molina were off that week on Sunday and Monday, got into an altercation during the arrest of an individual when they were working on Tuesday, and were out on disability Wednesday and Thursday, and there is no indication that they worked on this case when they returned on Friday. (Docket No. 231 ¶¶ 44, 226).  It is also undisputed that the evidence and money from these purported controlled buys were not property clerked until days after the search warrant was executed. (Docket No. 231 ¶¶ 51-52, 220-21, 246; Docket No. 221-5 ¶ 54; Docket No. 228-3 at 87:11-14, Docket No. 228-5).  A reasonable juror could infer from all of this that the controlled buys either did not occur, or at the minimum, did not occur prior to the arrest and execution of the search warrant.  Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether the controlled buys occurred

on March 13 and 16, before the execution of the search warrant, and therefore, whether the controlled buys could form the basis of probable cause for Plaintiff's arrest.

Defendants also argue that Plaintiff's constructive possession of the gun provides probable cause for his arrest based on the fact that Plaintiff was seen exiting the apartment and he had possession of the key that officers used to open the locked drawer containing the firearm. (Docket No. 226 at 13-14).  "Constructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Paulino*, 445 F.3d 211, 222 (2d Cir. 2006).  While "permanent residency is not a prerequisite to constructive possession," *United States v. Albarran*, 943 F.3d 106, 122 (2d Cir. 2019), "[m]ere proximity or presence" at the location of contraband is "insufficient to support a finding of constructive possession." *United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir. 2004).  Here, it is undisputed that the basement apartment at 480 South Broadway belonged to the mother of Plaintiff's children, Ms. Nmair, and that she gave Plaintiff full access to the apartment, including the code to the red front door and keys to the basement apartment. (Docket No. 225 ¶¶ 19, 20, 25-26; Docket No. 231 ¶¶ 19, 20, 25-26).  It is also undisputed that Plaintiff was often alone with his children in the apartment, and kept clothes and a toothbrush there. (Docket No. 225 ¶¶ 20, 25-26, 30, 33; Docket No. 231 ¶¶ 20, 25-26, 30, 33). However, there is a genuine dispute of material fact as to whether Plaintiff also had a key to the locked dresser drawer that contained the gun, with Plaintiff maintaining that Ms. Nmair had two keys to it and never gave Plaintiff one of them. (Docket No. 225 ¶¶ 23, 32; Docket No. 231 ¶¶ 23, 32, 95; Docket No. 224-2 at 53:11-55:13).  Whether Plaintiff had a key is "a factor that has been considered highly relevant in the determination of constructive possession in situations where contraband has been uncovered in a locked [area]." *Jenkins v. City of NY*, No. 10-CIV-

4535(AJN), 2013 WL 870258, at *10 (S.D.N.Y. Mar. 6, 2013) (collecting cases) (denying summary judgment for plaintiff's false arrest claim because there were "questions of fact as to whether the officers were reasonable in suspecting that [plaintiff] knew that there were drug sales in the apartment, and given that the contraband was possibly located in a locked room to which there [wa]s no evidence indicating that [plaintiff] had access.").  There is also a genuine dispute of fact as to whether Koch and Molina saw Plaintiff exiting the building during their surveillance and on the day of the search warrant execution.  Specifically, Plaintiff disputes that surveillance was conducted at 480 South Broadway during this investigation, that Koch and Molina observed Plaintiff exit the building that day, and that they were involved in his arrest, because Plaintiff claims it was Devito who arrested him. (Docket No. 225 ¶¶ 41, 75-76; Docket No. 231 ¶¶ 41, 75-76).  It does not matter that Plaintiff's control or dominion of the basement apartment is now undisputed because "the determination of whether probable cause existed must be made on the basis of the information possessed or reasonably available to the defendant at the time of the arrest." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 253 (E.D.N.Y. 2000).  Here, the information known to the officers before they arrested Plaintiff is in dispute — namely, whether they knew that Plaintiff had access to the locked gun drawer and could freely enter the apartment at 480 South Broadway.  These genuine disputes of material fact preclude granting summary judgment on Plaintiff's false arrest claim.  Further, "while a fact-finder could ultimately conclude from the record here that the officers had probable cause to arrest [Plaintiff], that conclusion would require the weighing of evidence and assessments of credibility, which go beyond the sorts of determinations that the Court may make in ruling on motions for summary judgment," particularly where the credibility of the officer defendants is at issue. *See D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 366-368 (S.D.N.Y. 2010).

Finally, Defendants argue that the discovery of marijuana on Plaintiff's person provided probable cause for his arrest. (Docket No. 226 at 12-13).  "For federal false arrest claims, even in circumstances where a preceding search is illegal, police officers may use evidence obtained in that illegal search to establish probable cause for an arrest." *Hatcher v. City of New York*, No. 15-CV-7500 (VSB), 2018 WL 1583036, at *3 (S.D.N.Y. Mar. 27, 2018) (citing *Townes v. City of New York*, 176 F.3d 138, 144-49 (2d Cir. 1999)); *see also Serrano v. City of New York*, No. 16-CIV-8105(AKH), 2018 WL 3392869, at *6 (S.D.N.Y. July 12, 2018), *aff'd*, 793 F. App'x 29 (2d Cir. 2019) ("Under *Townes*, the fruit of the poisonous tree doctrine cannot be used to 'link the unreasonable search and seizure' to what came next—the discovery of the marijuana cigarette on plaintiff's person—which unquestionably gave officers probable cause to arrest plaintiff[.]").

Here, it is undisputed that when Plaintiff walked out of the apartment on March 22, 2012, he had marijuana with him that he intended to sell. (Docket No. 225 ¶¶ 78, 82, 83, 84; Docket No. 231 ¶ 78; Docket No. 224-2 at 98:1-18).  Molina testified that he and Koch approached Plaintiff on March 22, 2012 and asked him whether he had any weapons or contraband on him, to which Plaintiff replied that he was in possession of marijuana, after which the officers recovered marijuana from him and handcuffed him. (Docket No. 225 ¶¶ 90-92; Docket No. 231 ¶¶ 90-92).  However, Plaintiff disputes this rendition.  He states that he was approached by Devito, who advised him that he had a warrant and then handcuffed Plaintiff and placed him in the back seat of his patrol car. (Docket No. 231 ¶¶ 75, 90-92; Docket No. 228-2 at 104:17-123:7).  Devito then allegedly went into 480 South Broadway to search the building, and returned to the car and showed Plaintiff the gun he claimed he found in the apartment, after which he brought Plaintiff to the YPD and read him his rights. (*Id.*).  Thus, in Plaintiff's version,

marijuana was not found on him prior to his arrest. (*Id*.).[11]  "When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (emphasis in original).  Given the genuine dispute of material fact regarding whether marijuana was found on Plaintiff's person at the time of or immediately before Plaintiff's arrest, the Court cannot determine as a matter of law that the officers had probable cause to arrest him, and, therefore, declines to grant summary judgment on Plaintiff's false arrest claim.

## B.  Malicious Prosecution

Defendants argue that summary judgment should be granted on Plaintiff's malicious prosecution claim because probable cause existed for each of the charges and Defendants learned no new facts between the arrest and the swearing of the criminal complaint that would shed doubt on the decision to charge Plaintiff with those offenses. (Docket No. 226 at 17-18). Defendants also assert that Plaintiff cannot satisfy the favorable termination element of his malicious prosecution claim. (*Id*. at 19-22).  Plaintiff contends, however, that Defendants did not have probable cause to prosecute Plaintiff and that the favorable termination element was met here because it does not require acquittal or a finding of actual innocence. (Docket No. 232 at 15-17).

---

[11] Defendants also argue that in his original complaint, Plaintiff stated that Defendant officers found twenty-six bags of marijuana on him, which is a judicial admission that binds Plaintiff. (Docket No. 226 at 12; Docket No. 1 at 8). However, in his amended complaint, Plaintiff makes no mention of any marijuana found on his person. (Docket No. 152).  While it is true that a "party's assertion of fact in a pleading is a judicial admission by which it normally is bound," *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004), "[i]t is well settled that an amended pleading ordinarily supersedes the original and renders it of no legal effect." *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000); *see also Roman v. City of Mount Vernon*, No. 21-CV-2214(KMK), 2022 WL 2819459, at *6 (S.D.N.Y. July 19, 2022) (declining to credit Plaintiff's previous admission made in prior iterations of his complaint where an amended complaint omitted reference to that fact).

A Section 1983 malicious prosecution claim requires the plaintiff to prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendants' actions." *Ferebee v. City of New York*, No. 15-CV-1868 (PAC), 2017 WL 2930587, at *5 (S.D.N.Y. July 6, 2017) (quoting *Stampf v. Long Island R. Co.*, 761 F.3d 192, 198 (2d Cir. 2014)). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). While related, "the probable cause inquiries for false arrest and malicious prosecution are distinct." *Thomas v. City of New York*, 562 F. App'x 58, 60 (2d Cir. 2014). "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013), and "unlike false arrest claims, the defendant must have possessed probable cause as to each offense charged," *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014). "In the malicious prosecution context, probable cause is the totality of 'facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.'" *Soto v. City of New York*, 132 F. Supp. 3d 424, 452 (E.D.N.Y. 2015) (quoting *Stanbury*, 721 F.3d at 95). "This inquiry considers the facts known or reasonably believed at the time the prosecution was initiated, and not at the time of arrest." *Id*. (internal quotation marks omitted).

As discussed above, there are genuine issues of material fact regarding whether Defendants had probable cause to arrest Plaintiff. Though it is disputed whether Defendants found marijuana on Plaintiff's person prior to arresting him, it is undisputed that he had marijuana on him when he was arrested. (Docket No. 225 ¶¶ 78, 82, 83, 84; Docket No. 231 ¶ 78; Docket No. 224-2 at 98:1-18). The marijuana was undoubtably discovered before Plaintiff's

arraignment, providing probable cause to prosecute him on the marijuana charge.  Thus, Defendants "cannot be held liable for malicious prosecution of that charge." *Curanaj v. Cordone*, No. 10-CV-5689(ER), 2012 WL 4221042, at *10 (S.D.N.Y. Sept. 19, 2012).  However, Defendants point to no new information obtained after the arrest that would provide them with probable cause to prosecute Plaintiff on the charges of possession of the gun and illicit drugs.  As a result, Defendants cannot meet the higher bar for establishing probable cause to prosecute Plaintiff as a matter of law for those charges. *See Simons v. New York*, 472 F. Supp. 2d 253, 264 (N.D.N.Y. 2007), *aff'd sub nom. Simons v. Fitzgerald*, 287 F. App'x 924 (2d Cir. 2008) (reasoning that because there were genuine issue of material fact regarding whether probable cause for arrest existed, and no additional facts came to light between plaintiff's arrest and arraignment to provide probable cause, the undisputed facts did not show that defendants had probable cause or arguable probable cause to prosecute plaintiff).

Furthermore, although the grand jury indicted Plaintiff here, (Docket No. 224-19), which "gives rise to a presumption that probable cause exists, this presumption may be rebutted by evidence of various wrongful acts on the part of police."[12] *Hincapie v. City of New York*, No. 18-CV-3432(PAC), 2022 WL 2870411, at *14 (S.D.N.Y. July 21, 2022) (internal quotation marks omitted); *see also Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of

---

[12] Plaintiff also references the rebuttable presumption created by a grand jury's indictment in the context of his false arrest arguments. (*See* Docket No. 232 at 13-14).  However, "the New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment 'applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions.'" *McClellan*, 439 F.3d at 145 (quoting *Broughton v. State,* 37 N.Y.2d 451, 456 (1975)).

probable cause created by the indictment may be overcome.).  Here, it is undisputed that the WCDAO's public integrity investigation found that Koch made statements of fact in his search warrant affidavit that conflicted with YPD and Yonkers Forensic Laboratory records. (Docket No. 231 ¶¶ 194-95, 234-36; Docket No. 220-13 at 2; Docket No. 224-13 at 1).  Specifically, the WCDAO determined that Koch inaccurately described CI 173's role in prior YPD arrests and incorrectly claimed that the evidence from the two controlled buys was property clerked prior to the submission of the search warrant application. (Docket No. 224-13 at 5; Docket No. 225 ¶ 141; Docket No. 231 ¶¶ 196, 197, 244-45).  The fact that the evidence was, in fact, not logged into the YPD Forensic Laboratory until nine days after the search warrant was executed was a factor in Fitzgerald's determination that there was a lack of foundation for probable cause for a search warrant. (Docket No. 231 ¶ 246).  Given these undisputed facts, a jury could reasonably determine that the search warrant, the evidence from the related search, and the resulting indictment based on that evidence were secured through bad faith or perjury.  Accordingly, the presumption of probable cause created by the indictment is overcome and Defendants cannot rely on probable cause as a complete defense to Plaintiff's malicious prosecution claim.

Defendants also argue that Plaintiff cannot satisfy the favorable termination element of his malicious prosecution claim because he pleaded guilty and because "Plaintiff's innocence was not indicated or affirmed by the vacatur of his conviction." (Docket No. 226 at 19-22). However, the Supreme Court recently clarified that the favorable termination element of a malicious prosecution claim under Section 1983 "does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence." *Thompson v. Clark*, 142 S. Ct. 1332, 1341, (2022).  "A plaintiff need only show that the criminal prosecution ended without a conviction." *Id*.  Here, it is undisputed that Plaintiff pleaded guilty to Attempted

Criminal Possession of a Weapon in the Third Degree. (Docket No. 225 ¶¶ 127-28, 135).  It is also undisputed that Plaintiff's conviction was subsequently vacated under CPL § 440.10 upon motion of the WCDAO. (Docket No. 225 ¶ 145; Docket No. 228-21; Docket No. 231 ¶ 145). Though "it is well settled that a guilty plea is not a termination in favor of the accused for purposes of a malicious prosecution claim," *Al -Anesi v. City of New York*, No. 18-CIV-8439(LAK)(GWG), 2022 WL 1948879, at *6 (S.D.N.Y. June 6, 2022), the vacatur of Plaintiff's conviction after his guilty plea satisfies the favorable termination factor, *see Hincapie*, 2022 WL 2870411, at *13, n.28 (holding that the vacatur of plaintiff's convictions satisfies this element even where "the vacating court found that [plaintiff] had not established actual innocence"); *see also Levine v. New York State Police*, No. 121-CV-1181(BKS)(CFH), 2022 WL 1987845, at *13 (N.D.N.Y. June 6, 2022) (holding that a vacated conviction satisfies the favorable termination factor even where plaintiff originally pleaded guilty, and then his conviction was vacated).  Thus, the vacatur of Plaintiff's conviction after he pleaded guilty satisfies the favorable termination element here.

Accordingly, the Court denies summary judgment on Plaintiff's malicious prosecution claim.

## C.  Denial of Due Process and Fair Trial

Defendants argue that Plaintiff's denial of due process and fair trial claims fail because Plaintiff has not demonstrated that Defendants falsified material evidence or that the fabricated evidence caused a deprivation of his liberty. (Docket No. 226 at 22-25).[13]  Plaintiff asserts that

---

[13] Defendants assert for the first time on Reply that though "Koch admitted to submitting a search warrant affidavit that contained false information…there is nothing in the record that shows that he did so intentionally or with malice." (Docket No. 233 at 7). "Issues raised for the first time in a reply brief are generally deemed waived." *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 (2d Cir. 2010).  Even if not waived, Defendants' argument is unavailing because "ill will or malice is not an element of a fabrication of evidence claim." *Holmes v. City of New York*, No. 14-CV-5253(LTS)(SDA), 2018 WL 11216673, at *2, n.1 (S.D.N.Y. June 11, 2018).

Koch and Molina falsified material evidence relating to the controlled buys and drafted a fraudulent criminal complaint.[14] (Docket No. 232 at 19-22).  Moreover, Plaintiff maintains that his guilty plea does not negate the deprivation of his liberty. (*Id*. at 20-22).

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 626 (E.D.N.Y. 2017).  To make out a Section 1983 claim for the denial of a right to a fair trial, the plaintiff must demonstrate that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett*, 838 F.3d at 279. The Second Circuit has permitted "claims for both malicious prosecution and denial of his fair right to trial based on the same alleged fabrication of evidence." *Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010).  Importantly, probable cause is not a defense to a denial of fair right to trial claim. *See Garnett*, 838 F.3d at 277-78.  Also, a plaintiff need not proceed to trial to have an actionable claim based on the denial of a right to a fair trial; rather, the allegedly false information must be material such that it would likely influence the jury if it arrived at a jury. *See Case v. City of New York*, 233 F. Supp. 3d 372, 388 (S.D.N.Y. 2017); *see also Schiller*

---

[14] Plaintiff also argues that "Koch and Molina continued to manipulate and mislead prosecutors in their criminal prosecution of Plaintiff by, among other things, interfering with the pre-trial evidentiary hearings by suppressing Plaintiff's right to test the sufficiency of the Search Warrant by refusing to produce CI 173 for a Darden Hearing." (Docket No. 232 at 22).  However, a claim for denial of a right to a fair trial cannot involve every officer's action that misleads or manipulates prosecutors; this claim necessary involves (a) fabricated information, (b) that is forwarded to prosecutors. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).  Even if there is a genuine dispute regarding whether Defendants refused to produce CI 173 for a Darden Hearing, this does not constitute fabricated information provided to prosecutors that would support a denial of a right to a fair trial claim.

Plaintiff further alleges that "Koch and Molina perjured themselves to the grand jury to secure an indictment," (Docket No. 232 at 22), but do not provide any support for this assertion, only citing generally to the officers' grand jury testimony transcripts.  Thus, this allegation of fabricated evidence is "sheer speculation, and does not create a material issue of fact for trial." *Greene v. City of New York*, No. 08-CV-00243(AMD)(CLP), 2017 WL 1030707, at *25 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018).

*v. City of New York*, No. 04-CIV-10178(RJS)(JC), 2008 WL 200021, at *10 (S.D.N.Y. Jan. 23, 2008), *aff'd*, 2009 WL 497580 (S.D.N.Y. Feb. 27, 2009).

Defendants claim that Plaintiff has not demonstrated that they falsified material evidence because the WCDAO investigation did not determine that Koch or Molina falsified information that was material to Plaintiff's charges. (Docket No. 226 at 23).  Defendants contend that the WCDAO merely found that one of the arrests listed by Koch in the search warrant affidavit was attributable to a different CI and that the evidence seized was sent to the lab after the warrant was executed. (*Id*.).  However, a reasonable jury could conclude that the evidence was not property clerked until nine days after the execution of the search warrant because the evidence was not obtained until after the search warrant was executed.  Therefore, a jury could find that the officers obtained the search warrant under false pretenses and lacked probable cause to arrest Plaintiff.  As such, "the alleged fabrications are central to the question of whether [the officer] had probable cause to arrest plaintiff [and obtain the search warrant] and, thus, would likely influence a jury." *Jean-Laurent v. Bowman*, No. 12-CV-2954(KAM)(LB), 2014 WL 4662232, at *3, n.1 (E.D.N.Y. Sept. 18, 2014).  Moreover, Plaintiff's prosecution was based on information provided by Koch and Molina; Koch wrote and signed the search warrant affidavit, (Docket No. 225 ¶ 55; Docket No. 228-10 at 154:24-156:12; Docket No. 231 ¶¶ 151-52), and Molina signed and executed the felony complaint, (Docket No. 224-17; Docket No. 225 ¶ 113; Docket No. 231 ¶¶ 113, 181).  Because Plaintiff's "prosecution was based on facts and documents provided by" Defendants and "a question of fact exists as to whether [Defendants] had probable cause to arrest [Plaintiff]," Defendants' motion for summary judgment on Plaintiff's fair trial claim is denied. *See Brandon*, 705 F. Supp. 2d at 276.

Defendants also argue that Plaintiff has not shown that Defendants falsified evidence that would likely influence a jury's decision because Plaintiff conceded that he possessed an unlawful amount of marijuana when he was apprehended and because any assertion that the gun or pills were planted in the locked dresser drawer are sheer speculation. (Docket No. 226 at 24). However, as discussed above in the context of Plaintiff's false arrest and malicious prosecution claims, there are genuine disputes of material fact regarding whether Plaintiff possessed a key to the locked drawer and thus, whether he had constructive possession of the gun found within it. Though it is undisputed that Plaintiff had marijuana on his person when he was arrested, there is a genuine dispute regarding whether the officers searched him and found the marijuana prior to arresting him, as discussed above.  Given that there are genuine disputes concerning the circumstances of Plaintiff's arrest, this Court cannot determine as a matter of law that Defendants' allegedly falsified search warrant affidavit and the resulting arrest were not material and would not influence a jury's decision. *See Haskins v. City of New York*, No. 15-CV-2016(MKB), 2017 WL 3669612, at *12 (E.D.N.Y. Aug. 24, 2017) ("Because there are disputed issues of fact regarding the circumstances of Plaintiff's arrest, Defendants are not entitled to summary judgment on Plaintiff's fabrication of evidence claim.").

Defendants further assert that any false information in the search warrant affidavit would more appropriately form the basis of an unlawful search claim rather than a deprivation of fair trial claim. (Docket No. 226 at 23-24) (citing *Falls v. (Police Officer) Detective Michael Pitt*, 16-CV-8863(KMK), 2021 WL 1164185, at *38 (S.D.N.Y. Mar. 26, 2021)).  Defendants' reliance on *Falls* is misplaced.  *Falls* is distinguishable from the instant case because the plaintiff in *Falls* alleged that the fabricated evidence was used to obtain a search warrant that resulted in a body cavity search, which is "appropriately framed as an unreasonable search claim, rather than a fair

31

trial claim." *Falls*, 2021 WL 1164185, at *38.  Here, Plaintiff's injury is a deprivation of liberty, not an unreasonable search, and the court in *Falls* acknowledged that "a deprivation of liberty may arise 'from an allegedly fabricated statement in a search warrant.'" *Id*.  It is undisputed that Plaintiff was deprived of his liberty between his arrest and June 3, 2012 when he posted bail and was released. (Docket No. 225 ¶ 126; Docket No. 231 ¶ 126; Docket No. 224-2 at 132:13-134:13).  Importantly, "[t]he deprivation need not be in the form of post-trial confinement," *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016), but could instead be based on a plaintiff's arrest and brief pre-trial detention, *Jean-Laurent*, 2014 WL 4662221, at *12; *see also Haskins*, 2017 WL 3669612, at *11 ("'[T]here can be no question' that a plaintiff suffered a deprivation of liberty when he was 'physically detained following arraignment.'").  Thus, taking the facts in the light most favorable to Plaintiff, a reasonable jury could determine that the alleged fabrication of evidence in the search warrant affidavit led to Plaintiff's arrest for possession of a weapon and illicit drugs, and the resultant deprivation of liberty in the form of his pre-trial confinement.

Defendants maintain that the proximate cause of Plaintiff's deprivation of liberty was his guilty plea not any alleged fabrication of evidence. (Docket No. 226 at 25).  It is undisputed that Plaintiff pleaded guilty to Attempted Criminal Possession of a Weapon in the Third Degree. (Docket No. 225 ¶¶ 127-28, 135).  However, as explained above, Plaintiff was deprived of his liberty prior to entering his guilty plea, due to his confinement after his arrest in March 2012 and until he posted bail in June 2012.  Further, "[f]oreseeability and causation…are issues generally and more suitably entrusted to fact finder adjudication" and the Court cannot determine as a matter of law that Plaintiff would have been confined in the absence of the officers' alleged fabrication of evidence. *See Maldonado v. City of New York*, No. 11-CIV-3514(RA), 2014 WL

787814, at *10 (S.D.N.Y. Feb. 26, 2014) (denying summary judgment for plaintiff's fabrication

of evidence claim where plaintiff was confined pre-trial before ultimately being acquitted of all

charges).[15]

Accordingly, the Court denies summary judgment on Plaintiff's denial of due process and

right to a fair trial claims.

## D.  Qualified Immunity

Defendants contend that each individually named Defendant is entitled to qualified

immunity for Plaintiff's false arrest and malicious prosecution claims.[16] (Docket No. 226 at 15-

16, 18-19).  Plaintiff argues that Defendants fail to demonstrate that they are entitled to qualified

immunity because they knowingly violated the law. (Docket No. 232 at 18).

"Qualified immunity shields police officers acting in their official capacity from suits for

damages ... unless their actions violate clearly-established rights of which an objectively

reasonable official would have known." *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006)

---

[15] Plaintiff also argues that because the conviction resulting from his guilty plea was overturned under CPL §
440.10, his "guilty plea is no longer evidence" because it is treated like a withdrawn guilty plea, which is
inadmissible under Federal Rule of Evidence 410. (Docket No. 232 at 21-22).  It is undisputed that Plaintiff's guilty
plea was vacated pursuant to CPL § 440.10. (Docket No. 225 ¶ 145; Docket No. 228-21; Docket No. 231 ¶ 145).
However, Plaintiff provides no direct authority for, and the Court is aware of none, that equates a vacated guilty plea
under CPL § 440.10 to a withdrawn guilty plea that is inadmissible under Federal Rule of Evidence 410.  Given that
the Court determined that Plaintiff's guilty plea does not break causation for purposes of his fair trial claim, the
Court deems it unnecessary to rule on whether evidence of Plaintiff's guilty plea or plea allocution is admissible
under Federal Rule of Evidence 410 at this time.

[16] Defendants raise a qualified immunity defense for Plaintiff's fair trial claim for the first time on Reply. (Docket
No. 233 at 8-13). "Issues raised for the first time in a reply brief are generally deemed waived." *Connecticut Bar
Ass'n*, 620 F.3d at 91, n.13.  In any event, Defendants have not established the qualified immunity defense as a
matter of law for Plaintiff's fair trial claim. "It is firmly established that a constitutional right exists not to be
deprived of liberty on the basis of false evidence fabricated by a government officer." *Maldonado*, 2014 WL
787814, at *10; *see also Rowell v. City of New York*, No. 16-CV-6598(AJN), 2018 WL 4682219, at *4 (S.D.N.Y.
Sept. 28, 2018) ("It was clearly established in 2014 that police officers violated the fair trial right of individuals
against whom they fabricated evidence.").  "The question is therefore whether it was 'objectively reasonable' for
[Defendants] to believe that [they] did not violate that right." *Maldonado*, 2014 WL 787814, at *10 (internal
citations omitted).  "Such a belief would be reasonable only if [Defendants] did not, in fact, fabricate evidence." *Id*.
"The reasonableness analysis is thus inextricably entwined with the merits, and the Court cannot resolve
[Defendants'] qualified immunity defense as a matter of law." *Id*.  Thus, summary judgment cannot be granted on
the basis of qualified immunity as to Plaintiff's fair trial claim.

(internal quotation marks omitted).  "The Supreme Court has established a two-part inquiry to determine when a district court should hold that the doctrine of qualified immunity bars a suit against government officials: (1) the court must first consider whether the facts alleged, when taken in the light most favorable to the party asserting the injury, demonstrate a violation of a constitutional right; and (2) the court must then consider whether the officials' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. (internal quotation marks and citations omitted).  "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021).  While qualified immunity "ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) (internal quotation marks and citations omitted).

"In the context of a false arrest claim, qualified immunity protects an officer if he had arguable probable cause to arrest the plaintiff." *Thomas v. City of New York*, No. 14-CIV-7513(ENV)(VMS), 2018 WL 4328825, at *11 (E.D.N.Y. Aug. 10, 2018), *report and recommendation adopted*, 2019 WL 3491486 (E.D.N.Y. July 31, 2019).  Similarly, "an officer is entitled to qualified immunity against a claim of malicious prosecution if the officer had arguable probable cause to arrest the plaintiff, and the officer's information about the probable cause does not adversely change." *Id*. at *12 (internal citations omitted).  "'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).  "Arguable probable cause exists if either (a) it was objectively reasonable

for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted).  "In the context of a malicious prosecution claim, arguable probable cause exists where, accounting for any new information learned subsequent to an arrest, 'it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff]' with the crime in question." *Creese v. City of New York*, 815 F. App'x 586, 590 (2d Cir. 2020).

Here, the Court finds that qualified immunity is not available to Defendants as a matter of law for Plaintiff's false arrest claim.  "The right not to be arrested…without probable cause" is a constitutional right that has long been clearly established. *Days v. Eastchester Police Dep't*, No. 18-CV-11538(NSR), 2020 WL 5504433, at *9 (S.D.N.Y. Sept. 9, 2020).  Further, the Court cannot determine as a matter of law that Defendants had arguable probable cause to arrest Plaintiff.  As explained above, there are genuine disputes of material fact as to arguable probable cause, namely "whether a reasonable officer could have believed, even mistakenly, that there was probable cause to arrest Plaintiff[] for constructive possession" of the gun, as well as for possession of marijuana and the other illicit drugs, and "whether an officer of reasonable competence could have believed there was probable cause to arrest Plaintiff[]." *See Thomas*, 2018 WL 4328825, at *12; *see also Duncan v. City of New York*, No. 11-CV-3901(ENV)(JO), 2016 WL 11263166, at *19 (E.D.N.Y. Sept. 29, 2016*), report and recommendation adopted as modified,* 2017 WL 3105856 (E.D.N.Y. July 21, 2017), and *adhered to on denial of reconsideration,* 2018 WL 3421312 (E.D.N.Y. July 13, 2018) ("Where there is a genuine factual dispute about an officer's conduct, or about the circumstances that might render the officer's

belief in the lawfulness of that conduct objectively reasonable, summary judgment is unwarranted.").

Qualified immunity is also not available for Plaintiff's malicious prosecution claim. "Freedom from malicious prosecution" is a clearly established constitutional right. *See Days*, 2020 WL 5504433, at *9. Given that the Court found that Defendants had probable cause to prosecute Plaintiff for possession of marijuana, the inquiry regarding whether they had arguable probable cause for that prosecution is irrelevant. *See Stansbury*, 721 F.3d at 89, n.3 ("If an officer had probable cause, he or she also had arguable probable cause."). However, the officers did not have arguable probable cause to prosecute Plaintiff for the possession of the gun and illicit drugs because the record does not reveal that any new information was learned after Plaintiff's arrest that would not make it "manifestly unreasonable for [the defendant officer] to charge" the plaintiff with these crimes. *Creese*, 815 F. App'x at 590. Further, even though the officers had probable cause or arguable probable cause to prosecute Plaintiff on the marijuana possession charge, "they are not shielded from liability" under qualified immunity for all of the charges given that there are questions of fact regarding whether the officers fabricated evidence, as discussed above. *See Azurdia v. City of New York*, No. 18-CV-04189(ARR)(PK), 2019 WL 1406647, at *14 (E.D.N.Y. Mar. 28, 2019). Plaintiff contends that Defendants fabricated evidence regarding the existence of probable cause in order to procure the search warrant. (Docket No. 232 at 18). Assuming Plaintiff's allegation is true, "extension of qualified immunity in such circumstances would thwart the basic purpose of § 1983 itself—to protect persons from abuse of official authority." *Mejia*, 119 F. Supp. 2d at 273; *see also Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("[I]t would be objectively unreasonable for [an officer] to believe he had probable cause to arrest [plaintiff] if [the officer] himself fabricated the

grounds for arrest."). Further, "[i]f [Plaintiff's] version of events is believed," Koch's and Molina's story "is false, and qualified immunity does not protect 'those who knowingly violate the law.'" *See Peralta v. City of New York*, No. 15-CV-4455(PKC), 2019 WL 3239349, at *6 (S.D.N.Y. July 18, 2019).

Thus, Plaintiff's false arrest and malicious prosecution claims cannot be dismissed on the basis of qualified immunity.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied in its entirety. The Clerk is respectfully requested to terminate the pending Motion (Docket No. 223).

Dated:    September 27, 2022
              White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge